## DIGGS v. UNITED STATES.†

### CAMINETTI v. SAME.

(Circuit Court of Appeals, Ninth Circuit.   March 18, 1915.   Concurring Opinion April 8, 1915.)

Nos. 2404, 2405.

1. CRIMINAL LAW ☞721, 857—WITNESSES ☞305—PRIVILEGE FROM SELF-INCRIMINATION—WAIVER—COMMENTS ON FAILURE TO TESTIFY.

Under Const. Amend. 5, providing that no person shall be compelled in any criminal case to be a witness against himself, and Act March 16, 1878, c. 37, 20 Stat. 30 (Comp. St. 1913, § 1465), providing that a person charged with an offense shall at his own request, but not otherwise, be a competent witness, and that his failure to make such a request shall not create a presumption against him, where a person charged with crime testifies in his own behalf, the waiver is complete, and he is no longer under the protection of the amendment, and his failure to testify concerning certain matters may properly be commented on and considered by the jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1672, 2054, 2055; Dec. Dig. ☞721, 857; Witnesses, Cent. Dig. §§ 1053–1057; Dec. Dig. ☞305.]

2. CRIMINAL LAW ☞780—INSTRUCTIONS—TESTIMONY OF ACCOMPLICE.

While it is the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, it is not reversible error to refuse an instruction to this effect.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1859–1863; Dec. Dig. ☞780.]

3. CRIMINAL LAW ☞510—TESTIMONY OF ACCOMPLICES—CORROBORATION.

In the federal courts, corroboration of the testimony of an accomplice is not necessary to support a conviction.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1124–1126; Dec. Dig. ☞510.]

4. CRIMINAL LAW ☞507—TESTIMONY OF "ACCOMPLICES"—CORROBORATION.

Women transported from one state to another for an immoral purpose are not "accomplices" to the offense of transporting them and furnishing tickets for their transportation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1082–1096; Dec. Dig. ☞507.

For other definitions, see Words and Phrases, First and Second Series, Accomplice.]

5. WITNESSES ☞268—CROSS-EXAMINATION OF ACCUSED—SCOPE.

Where, on a trial for transporting women from one state to another for an immoral purpose, though accused testified to nothing that occurred on the trip to such other state, he repeatedly referred in his testimony as to matters previously occurring to such trip to R., it was not improper to allow him to be asked on cross-examination what he meant by the R. trip, and whether he was accompanied on such trip by the women in question and another man charged with a similar offense.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 931–948, 959; Dec. Dig. ☞268.]

6. WITNESSES ☞268—CROSS-EXAMINATION OF ACCUSED—SCOPE.

Where, on such trial, one of the women on cross-examination testified to intimate relations with accused, a question asked him on cross-examination as to whether he suggested to his counsel the questions asked her, to which he replied that he suggested that to his counsel a long time before he came into the courtroom, and might have made the suggestion during her cross-examination, and the statement of counsel for the gov-

ernment that the defense, prompted by the defendant, put such questions, were not improper.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 931–948, 959; Dec. Dig. ☞268.]

**7. CRIMINAL LAW ☞723—ARGUMENT OF COUNSEL.**

On a trial for transporting women from one state to another for immoral purposes, the prosecuting attorney in his argument stated that the eyes of the people of the United States were on the jury, and that 60,-000,000 or 90,000,000 people were awaiting the verdict, respecting which statement the court, when objection was made, stated that this was merely a form of speech and that counsel should confine himself to the evidence. Counsel further remarked that, if there was any man who had sunk to the uttermost depths of depravity, it was the man in form alone who seduced a girl and then exposed her shame to the world, and that if he had one redeeming trait of character, having blasted the life of a virgin, he would go to the penitentiary before going before a jury and admitting that he seduced her, and recounting the times when he had illicit intercourse with her, and that a decent man would die first, to which objection was made on the ground that accused had made no such admissions. Counsel further remarked that the government demanded that the laws enacted for the protection of young and decent women be rigidly enforced, and that an acquittal would be a blot upon the name of the state. The court told the jury to be guided solely by the evidence, and not by the statements or declarations of counsel, and accused requested no further instruction on this point. *Held,* that there was nothing so offensive or inflammatory in the remarks as to require a reversal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1663, 1674, 1676; Dec. Dig. ☞723.]

**8. PROSTITUTION ☞1—TRANSPORTATION OF WOMEN FOR IMMORAL PURPOSES—ELEMENTS OF OFFENSES.**

The immorality denounced by the White Slave Traffic Act (Act June 25, 1910, c. 395, 36 Stat. 825 [Comp. St. 1913, § 8813]), prescribing the punishment for knowingly transporting any woman or girl in interstate commerce for the purpose of prostitution or debauchery, or for any other immoral purpose, is not limited to commercialized vice, and the act applies to transportation for the purpose of making the girl the concubine or mistress of the person transporting her.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. §§ 1, 2; Dec. Dig. ☞1.

Violations of White Slave Act, see note to Savage v. United States, 130 C. C. A. 2.]

**9. CRIMINAL LAW ☞814—INSTRUCTIONS—CONFORMITY TO EVIDENCE.**

On a trial for transporting a woman from one state to another for an immoral purpose, an instruction that, in considering her testimony and the weight to be given thereto, the jury might consider her motive in testifying, whether she had been or appeared to be acting under the influence of any person, and whether any promise of immunity had been offered to her, and any hope she might have for leniency in any criminal action brought against her, was properly refused, where there was no evidence tending to show any promise of immunity, or that she was acting under the influence of any one.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1821, 1833, 1839, 1860, 1865, 1883, 1890, 1924, 1979–1985, 1987; Dec. Dig. ☞814.]

**10. PROSTITUTION ☞4 — TRANSPORTATION FOR IMMORAL PURPOSE — SUFFICIENCY OF EVIDENCE.**

Evidence *held* to support a conviction of C. for transporting two women from one state to another for an immoral purpose, though D., charged with a similar offense, purchased the tickets for the transportation.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. § 4; Dec. Dig. ☞4.]

11. PROSTITUTION ⊜⇒5—TRANSPORTATION OF WOMEN FOR IMMORAL PURPOSES —INSTRUCTIONS.

Where, on a trial for transporting and procuring tickets for the transportation of women from one state to another for an immoral purpose, to wit, that they should be and become the concubines and mistresses of accused and another person charged with the same offense, the court read the indictment and statute to the jury, explained the meaning of the terms of the statute, defined "concubine," "mistress," and the term "debauchery," as used in the statute, and charged that if the women were taken to another state as testified by them, and while there accused and his companion cohabited with them as the testimony tended to show, the jury might find that they were taken there with the immoral purpose and intent charged, the jury could not have understood, as claimed, that accused and his companion were guilty if they merely seduced the girls.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. § 5; Dec. Dig. ⊜⇒5.]

Ross, Circuit Judge, dissenting.

In Error to the District Court of the United States for the First Division of the Northern District of California; Wm. C. Van Fleet, Judge.

Maury I. Diggs and F. Drew Caminetti were separately convicted of offenses, and they bring error. Affirmed.

Robert T. Devlin and Marshall B. Woodworth, both of San Francisco, Cal. (S. Luke Howe, of Sacramento, Cal., and Nathan C. Coghlan, of San Francisco, Cal., of counsel), for plaintiffs in error.

J. A. Cooper, of San Francisco, Cal. (Anthony Caminetti, Jr., of San Francisco, Cal., of counsel), for plaintiff in error Caminetti.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge. The two cases named above, although separately tried, arose out of a single transaction, in which each of the plaintiffs in error was involved. For the reason that the points presented to this court are similar in the two cases, they will be disposed of in a single opinion of this court.

The indictment against Diggs contained six counts. He was convicted on the first four counts, and there was no verdict on the last two. The first count charged him with transporting Marsha Warrington from Sacramento, Cal., to Reno, Nev., for the purpose of debauchery, and for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become his concubine and mistress. The second count charged him with transporting Lola Norris from Sacramento to Reno, that she might become the mistress and concubine of Caminetti. The third count charged him with procuring a ticket for Marsha Warrington from Sacramento to Reno, with the intent that she should become his concubine and mistress. The fourth count charged him with buying a ticket for Lola Norris, with the intent that she should give herself up to debauchery, and for an immoral purpose, to wit, that she could be and become the concubine and mistress of Caminetti. The fifth and sixth counts charged him with persuading,

inducing, and enticing Marsha Warrington and Lola Norris to go to Reno for the immoral purposes set forth in the other counts.

The indictment against Caminetti contained four counts. The indictment was similar to that against Diggs, excepting the two counts relating to the purchase of tickets were omitted from Caminetti's indict-.ment. He was convicted on the first two counts and acquitted on the last two.

[1] Error is assigned to the following instruction to the jury:

"After testifying to the relations between himself and Caminetti and these girls down to the Sunday night on which the evidence of the government tends to show the trip to Reno was taken, he stops short and has given none of the details or incidents of that trip, nor any direct statement of the intent or purpose with which that trip was taken, contenting himself by merely referring to it as having been taken, and by testifying to his state of mind for some days previous to the taking of that trip. Now this was the defendant's privilege, and, being a defendant, he could not be required to say more if he did not desire to do so; nor could he be cross-examined as to matters not covered by his direct testimony. But in passing upon the evidence in the case for the purpose of finding the facts you have a right to take this omission of the defendant into consideration. A defendant is not required under the law to take the witness stand. He cannot be compelled to testify at all, and if he fails to do so no inference unfavorable to him may be drawn from that fact, nor is the prosecution permitted in that case to comment unfavorably upon the defendant's silence; but where a defendant elects to go upon the witness stand and testify, he then subjects himself to the same rule as that applying to any other witness, and if he has failed to deny or explain acts of an incriminating nature that the evidence of the prosecution tends to establish against him, such failure may not only be commented upon, but may be considered by the jury with all the other circumstances in reaching their conclusion as to his guilt or innocence, since it is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so."

This assignment presents the question whether the waiver of the privilege of silence by a defendant in a criminal case in becoming a witness in his own behalf is a complete waiver, so as to place him in the position of any other witness in the case, or is only a partial waiver; that is to say, a waiver so far as the defendant sees fit to testify, leaving him, as to other matters, still under the protection of the fifth amendment. The statute of March 16, 1878 (U. S. Comp. Stats. of 1913, § 1465), provides that a person charged with an offense "shall at his own request but not otherwise be a competent witness. And his failure to make such a request shall not create any presumption against him." Upon a careful and cautious consideration of the question we reach the conclusion that the statute should be held to mean that the waiver is complete, and that when it has been made the defendant is no longer under the protection of the amendment.

The only cause we have found for hesitation in reaching that conclusion is the fact that the Circuit Court of Appeals for the Eighth Circuit, a court for which we entertain the highest respect, in a similar case (Balliet v. United States, 129 Fed. 689, 64 C. C. A. 201), held such an instruction reversible error. It is to be said, however, that while the opinion in that case contains no discussion of or reference to any adjudicated case of the state courts we think it is not improbable

that the conclusion reached was influenced by the then settled rule of the Supreme Court of the state of Missouri. But in 1913 the Supreme Court of Missouri in State v. Larkin, 250 Mo. 218, 157 S. W. 600, 46 L. R. A. (N. S.) 13, overruled its prior decisions. In that case the court said:

"We have carefully examined the statutes and holdings upon, this question of more than 30 states, and we find that it has been held universally that, if the defendant is not sworn as a witness in his own behalf, any comment by the prosecuting attorney on his failure so to testify constitutes reversible error, in the absence of a peremptory and proper rebuke by the trial court. But, on the other hand, except in our own state and in California, where the question has been sometimes doubted, the right of the prosecuting attorney to comment upon the failure of the defendant, when he takes the stand as a witness in his own behalf, to deny or explain incriminating facts and statements, has been uniformly held allowable:"

After citing numerous cases the court proceeded:

"The rule that no reference shall be made to the neglect, failure, or even refusal of a defendant to avail himself of his right to testify shall not be commented on, in the event he does not become a witness in his own behalf, is therefore, we find, universal; but, on the contrary, the rule that if he does go upon the witness stand he then stands in the precise attitude of of any other witness is, except in this state, and, as stated, in California, where the rule is subject to some doubt, also universal: Mr. Wharton, in his learned and able work on Criminal Evidence, lays down in the tenth edition thereof the rule that such comment is allowable."

And the court referred to the earlier rule in Missouri as expressed in State v. Musick, 101 Mo. 271, 14 S. W. 214, in which it was said:

"These statements made by the state's witnesses were not denied by defendant, and therefore stand admitted, as much so as if the defendant had admitted them in terms."

We think that the opinion in Reagan v. United States, 157 U. S. 301, 15 Sup. Ct. 610, 39 L. Ed. 709, should be taken as affirming, in substance, what was said of the rule so expressed in State v. Larkin. In that case Mr. Justice Brewer, for the court, referring to the act of March 16, 1878, said:

"On the other hand, if he avail himself of this privilege, his credibility may be impeached, his testimony may be assailed, and is to be weighed as that of any other witness. Assuming the position of a witness, he is entitled to all its rights and protections, and is subject to all its criticisms and burdens. It is unnecessary to consider whether, when offering himself as a witness as to one matter, he may either, at the will of the government or under the discretion of the court, be called upon to testify as to other matters. That question is not involved in this case, and we notice it simply to exclude it from the scope of our observation. The privileges and limitations to which we refer are those which inhere in the witness as a witness, and which affect the testimony voluntarily given. As to that, he may be fully cross-examined. It may be assailed by contradictory testimony. His credibility may be impeached, and by the same methods as are pursued in the case of any other witness. The jury properly consider his manner of testifying, the inherent probabilities of his story, the amount and character of the contradictory testimony, the nature and extent of his interest in the result of the trial, and the impeaching evidence in determining how much of credence he is entitled to."

In Brown v. Walker, 161 U. S. 591, 597, 16 Sup. Ct. 644, 647 (40 L. Ed. 819) the court said:

"Thus, if the witness himself elects to waive his privilege, as he may doubtless do, since the privilege is for his protection and not for that of other parties, and discloses his criminal connections, he is not permitted to stop, but must go on and make a full disclosure."

In Fitzpatrick v. United States, 178 U. S. 304, 316, 20 Sup. Ct. 944, 949 (44 L. Ed. 1078) the court said:

"While the court would probably have no power of compelling an answer to any question, a refusal to answer a proper question put upon cross-examination has been held to be a proper subject of comment to the jury"—citing State v. Ober, 52 N. H. 459, 13 Am. Rep. 88.

In State v. Ober, so cited, the court said:

"Upon the whole, we are unable to reach any other conclusion than that the respondent's testimony, so far as it went (and not less the fact that it went no further), his refusal to submit to a full cross-examination, within proper limits, after waiving his constitutional privilege, and all his conduct and demeanor, were proper matters for comment by counsel and court, as well as for the consideration of the jury."

How the Circuit Court of Appeals for the First Circuit understood the decision in the Fitzpatrick Case is shown in Jacobs v. United States, 161 Fed. 694, 699, 88 C. C. A. 554, 559, where Judge Putnam said:

"He offers himself as a witness, and therefore puts himself in the position of any other witness, so far that he may be examined with reference to anything pertinent to the case and admissible in evidence therein."

Very numerous decisions of the state courts may be cited which support the ruling of the court below in giving the instruction which is assigned as error. Thus, in State v. Tatman, 59 Iowa, 471, 13 N. W. 632, the court said:

"The attention of the jury may properly be called to the fact that the defendant has not testified as to a certain part of the case."

In Comstock v. State, 14 Neb. 205, 15 N. W. 355, it was held that a failure of the defendant to contradict a fact within his personal knowledge is in the nature of an admission of such fact. In Heldt v. State, 20 Neb. 492, 30 N. W. 626, 57 Am. Rep. 835, the court held that the district attorney may comment on such omission. In State v. Ulsemer, 24 Wash. 657, 64 Pac. 800, it was held that comment might be made upon the defendant's failure to deny incriminating facts in the evidence. The court said:

"He assumes the character of a witness * * * the same as any other witness."

The same rule has been applied in Kansas (State v. Glave, 51 Kan. 330, 33 Pac. 8), and in Alabama (Cotton v. State, 87 Ala. 103, 6 South. 372). In Clarke v. State, 87 Ala. 71, 6 South. 368, the court said:

"Like any other witness he must submit to cross-examination, and his failure to explain any fact or circumstances in his knowledge tending to exculpate him, is a proper subject of comment by the prosecution."

In Lee v. State, 56 Ark. 4, 19 S. W. 16, it was held that the failure of one charged with crime to testify in his own behalf shall not create a presumption against him, and does not prevent the prosecuting attorney commenting on defendant's failure to deny certain testimony in

relation to facts of which he must have had knowledge. In Brashears v. State, 58 Md. 568, the court in a similar case said:

"His conduct on the witness stand, and his silence, when testifying, as to matters within his knowledge, were circumstances which the jury had a right to consider in deciding upon the credit due to the witness, in connection with the other facts proved in the case, and they were, therefore, necessarily circumstances upon which the state's attorney had a right to comment in addressing the jury."

In State of Nevada v. Harrington, 12 Nev. 125, 130, the court said:

"Our conclusions are that, if the defendant in a criminal action voluntarily testifies for himself, the same rights exist in favor of the state's attorney to comment upon his testimony, or his refusal to answer any proper question, or to draw all proper inferences from his failure to testify upon any material matter within his knowledge, as with other witnesses."

Many other cases may be cited to the same effect, and the text-books adopt the rule thus expressed as established by a uniform line of decisions. In Wharton's Criminal Evidence, § 681, it is said:

"But if the defendant, having full opportunity to do so, failed on the stand to controvert that which was testified against him, this may be regarded, when the matter is one within his personal knowledge, as an admission of the truth of such testimony."

And such, we think, is the meaning of the decisions of the Supreme Court of the United States, cited above, and epitomized in Sawyer v. United States, 202 U. S. 150, 165, 26 Sup. Ct. 575, 579 (50 L. Ed. 972, 6 Ann. Cas. 269), where it is said:

"It has been held in this court that a prisoner who takes the stand in his own behalf waives his constitutional privilege of silence, and that the prosecution has the right to cross-examine him upon his evidence in chief with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the crime."

We take this to mean that the waiver of the constitutional privilege of a defendant in a criminal case is a complete waiver, and places the defendant in the same attitude as that of a defendant in a civil action who testifies in his own behalf.

The plaintiff in error waived his privilege of silence when he took the witness stand and testified as to the subject-matter of the offense with which he was charged. He testified at length and in detail as to his relations with the two girls and his codefendant covering a considerable period of time, and ending abruptly at the railroad station at a late hour of the night on which the party took the train for Reno. There he stopped. He made no denial of the testimony that he purchased the train tickets and procured the drawing room on the Pullman car, or that the drawing room was actually occupied by the members of the party in the manner in which the girls testified that it was. Nor did he deny his participation in the discussion of the plan of securing a cottage or bungalow at Reno in which the party were to live during their stay at Reno. The jury, even in the absence of instruction from the court, would inevitably have taken his omission to testify as to those incidents to be an admission of the facts testified to by the two girls.

[2-4] Error is assigned to the denial of defendant's request for.an instruction that the jury should determine from the evidence and circumstances whether Marsha Warrington and Lola Norris, or either of them, were accomplices of the defendants, and that, if it was found that they were, the testimony of an accomplice should be received with caution and weighed and scrutinized with great care by the jury, and that the jury should not regard the testimony of an accomplice, unless she is confirmed and corroborated in some material parts of her evidence. To this it is to be said:

First. A refusal to instruct as to the value of the testimony of an accomplice is not error for which a judgment should be reversed. In Holmgren v. United States, 217 U. S. 509, 523, 30 Sup. Ct. 588, 592 (54 L. Ed. 861, 19 Ann. Cas. 778), the court said:

"It is undoubtedly the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to them."

Other courts also have said that such was the better practice, but, as the rule is stated in 2 Bishop, New Crim. Procedure, 1169, "they are not as of law required to give this advice."

Notwithstanding the views expressed by the Supreme Court in the Holmgren Case as to the better practice, that court and the federal courts generally have held that corroborating testimony is not necessary to support a conviction. This court so held in Lung v. United States, 218 Fed. 817, 134 C. C. A. 505. And it is believed that no court, state or federal, has held that it is reversible error to refuse to caution the jury to scrutinize with care the testimony of an accomplice. In Cheatham v. State, 67 Miss. 335, 7 South. 204, 19 Am. St. Rep. 310, the court said:

"The suspicion with which the testimony of accomplices is received by the courts, and their unwillingness to sustain convictions resting wholly upon the uncorroborated evidence of such persons, has led to the very .general practice of advising juries to act with great prudence and suspicion upon such evidence, and to acquit unless there is corroboration in material particulars. But our researches have failed to discover a case in which a conviction has been set aside by reason of the court refusing so to instruct or advise."

The court, in that case, cited State v. Haney, 19 N. C. 390, in which, it was said, the Supreme Court of North Carolina had declared the true rule upon the subject, which was that:

"The practice of giving such instructions or advice to the jury rests in the discretion of the presiding judge, and his refusal so to do is not assignable as error." "No one," said the court, "can require of the judge to give an instruction to the jury, except on the law of the case. The judge may caution them against reposing hasty confidence in the testimony of an accomplice. It is usual, justifiable, and, we add, it is proper, to do so, where he has cause to apprehend that the jury may feel themselves bound to find a verdict conforming to the positive testimony of the witness, without weighing the circumstances of suspicion and distrust under which his testimony is rendered."

See note to Commonwealth v. Price, 71 Am. Dec. 678, in which a large number of cases are cited to the same effect.

In the present case the court instructed the jury that the evidence must be such as to satisfy their minds beyond a reasonable doubt and

to a moral certainty, and said that they should take into consideration the character and conduct of each witness, his relation to the controversy and to the parties, his expressed or apparent bias or partiality, the reasonableness or unreasonableness of the statements he makes, and all other elements which tend to throw light upon his credibility.

Second. We are of the opinion that as to the counts of the indictments on which the defendants were found guilty neither Marsha Warrington nor Lola Norris was an accomplice, for, while there was testimony on which, if credited, Marsha Warrington might have been deemed an accomplice of the defendants in persuading, inducing, and enticing Lola Norris to go to Reno, under the last two counts of the indictments that question is eliminated from the case by the verdict of the jury in acquitting each of the defendants on those counts.

"The test by which to determine whether one is an accomplice is to ascertain whether he could be indicted for the offense of which the accused is being tried." 12 Cyc. 445.

"Where a penal statute is intended for the protection of a particular class of persons, one of that class does not become an accomplice by submitting to the injury." 1 McClain, Criminal Law, § 199.

Thus it is universally held that a woman on whom an abortion is committed is not an accomplice, although she assents to the act. But one may sustain such relation to an offense that, while not an accomplice in the commission of that offense, he may be indicted for a conspiracy to commit the offense. This was what was decided in United States v. Holte, 236 U. S. 140, 35 Sup. Ct. 271, 59 L. Ed. ——. There it was held that it was not impossible for a woman transported in violation of the act of June 25, 1910, to be guilty of crime in conspiring for the commission of that offense. The court said:

"A conspiracy to accomplish what an individual is free to do may be a crime."

And the ruling of the court was illustrated by a reference to the crime of abortion, as to which, said the court:

"A woman may conspire to procure an abortion upon herself when under the law she could not commit the substantive crime, and therefore it has been held she cannot be an accomplice."

The court recognized the parity between the offense committed in transporting, or causing to be transported, a woman under the act of June 25, 1910, and the crime of abortion, and the rule that, while the person as to whom either offense is committed cannot be an accomplice, she may be prosecuted as a co-conspirator to procure the commission of the offense.

[5] It is said that the trial court erred in compelling the defendant Diggs to testify to certain matters which were not the proper subject of cross-examination. In his direct testimony he had referred to conversations between the parties which took place just prior to the Reno trip, and in his direct examination he had said:

"I got the full information of all the trains and also the cost of transportation between different places from Sacramento to various positions. The next train leaving town was 10:45, the eastward train, and we all agreed to catch that train."

On his cross-examination, without objection, he had testified:

"I met Miss Warrington and Miss Norris frequently the first week preceding our trip to Reno."

And again he had said, also without objection:

"We left for Reno two weeks after meeting her on the levee."

Again he had said:

"I believe that was one week before we left for Reno on a Sunday night."

And again:

"That night we went to Reno."

After this testimony had been given, counsel for the government propounded this question:

"Q. In your testimony you have referred repeatedly to conversations and conferences that took place before the Reno trip. Now, what did you understand or mean by the Reno trip?"

The question was objected to as not cross-examination. The court overruled the objection and remarked:

"He is not asking him what occurred on that trip. He is simply identifying the trip."

The witness answered:

"It is perfectly evident what trip it was."

And in answer to the question:

"On that trip were you accompanied by Mr. Caminetti, Miss Norris, and Miss Warrington?"

—the question was objected to as not cross-examination, and the witness answered:

"They were along; yes."

We are unable to see upon what ground it can be held that the testimony so admitted constituted error for which the judgment should be reversed. After the witness had referred frequently to the "Reno trip," it was not improper to ask him to identify the trip, and that was all that was done.

[6] It is contended that there was misconduct of counsel for the prosecution, permitted and condoned by the trial judge, prejudicial to the defendant Diggs, in that counsel for the government was permitted to ask of the said defendant on his cross-examination whether, during the course of the trial, and during the cross-examination of Marsha Warrington, he had not repeatedly suggested to his counsel questions to be propounded to her. Marsha Warrington on her cross-examination had testified as to her intimate relations with Diggs, in answer to questions propounded by the latter's counsel. Following this, and while Diggs was on cross-examination, he was asked:

"Didn't you suggest that question to your counsel? A. Well, I suggested that to my counsel a long time before I came into the courtroom; * * * that suggestion may have been made by me during the cross-examination of Miss Warrington. I won't say that I did not make the suggestion."

In view of that testimony, there was clearly no error in the ruling of the court upon the question which is presented in the assignment of error. It follows that it is not ground for reversing the judgment in the Diggs case that counsel for the government remarked:

"Counsel for the defense, prompted by the defendant, put these questions to Marsha Warrington."

[7] Error is assigned to certain statements and animadversions made by the government counsel as to the facts before the jury, the guilt of the defendants, the sanctity of the home, and the importance of the cases under consideration. The remarks of counsel principally complained of in both cases are the following:

"The eyes of not only the people of the state of California are upon you, gentlemen of the jury, awaiting your verdict in this case, but the people of all these United States; 60,000,000 or 90,000,000 people are awaiting your verdict in this case."

Upon objection of counsel for the defendants, the court observed:

"That is merely a form of speech"

—and directed counsel to confine himself to the evidence.

Again counsel for the government, in addressing the jury, said:

"Gentlemen, if there is any depraved man in the world, if there is any man who has sunk to the uttermost depths of depravity, it is that man in form, because he is a man in form alone, who seduces an innocent girl and then exposes her shame to the world. If he had one redeeming trait of character in his composition, having blasted the life of that virgin, he ought to be willing to take 50 years in the penitentiary before he would come before a jury of his fellow citizens, and before the world, and say, Yes, I seduced that girl; before he would come before a jury of his fellow citizens and recount time after time when he had illicit intercourse with this girl. A decent man would die first."

In the Diggs case objection was made by his counsel, Mr. Devlin, as follows:

"If your honor please, I except to that, because no such language came from the defendant; it all came from Marsha Warrington.

"Mr. Roche: It came from Marsha Warrington upon your cross-examination for the first time.

"Mr. Devlin: We had a right to cross-examine her.

"The Court: Mr. Sullivan, confine yourself to the evidence; don't transgress it."

In the Caminetti case counsel for the government said:

"The government of these United States, gentlemen of the jury, whom we have the honor to represent here, your government, as well as my government, the government of all of us, demands that the laws enacted for the protection and preservation of its young and decent women be adequately and rigidly enforced. An acquittal in this case would be a miscarriage of justice, and it would be a blot upon the fair name and escutcheon of California."

In this connection it is to be observed that in charging the jury the court said:

"I should suggest to you, gentlemen, that the statements or declarations of counsel made at the bar are in no sense evidence for your consideration. You are to confine your consideration alone to the evidence that has been admitted before you from the witness stand or in the way of exhibits or other physical objects which may have been laid before you."

And the court admonished the jury that they must not permit them-
selves to be influenced in their verdict by the fact that the case had
attracted so much attention and given rise to so much controversy in
the public press, in the halls of Congress, and among the people.  The
court said:

"Those facts are wholly extraneous to your inquiry or to mine, and we
have nothing whatsoever to do with them.  They in no way affect the merits
of the case, and you should be careful to avoid permitting any feeling of bias
or prejudice flowing therefrom to find reflection in your verdict."

Counsel for the defendants were apparently satisfied with these in-
structions, and they made no request in either case that the jury be
instructed to disregard the remarks of counsel.  It is the general rule
that improper remarks in argument by the prosecuting attorney, al-
though prejudicial, do not justify reversal, unless the court has been
requested to instruct the jury to disregard them, and has refused to
do so.  12 Cyc. 585.  In People v. Shears, 133 Cal. 154, 65 Pac. 295,
it was held that, where the defendant did not invoke the action of the
court to instruct the jury that it was improper, and to disregard it,
but merely excepted to the remarks of the district attorney, the im-
propriety is not ground for reversal of the judgment, upon conviction
of manslaughter.  A similar ruling was made in People v. Babcock,
160 Cal. 537, 117 Pac. 549.

In Dunlop v. United States, 165 U. S. 486, 498, 17 Sup. Ct. 375, 379
(41 L. Ed. 799) the court said:

"There is no doubt that, in the heat of argument, counsel do occasionally
make remarks that are not justified by the testimony, and which are, or may
be, prejudicial to the accused.  In such cases, however, if the court interfere,
and counsel promptly withdraw the remark, the error will generally be
deemed to be cured.  If every remark made by counsel outside of the testi-
mony were ground for a reversal, comparatively few verdicts would stand,
since in the ardor of advocacy, and in the excitement of trial, even the most
experienced counsel are occasionally carried away by this temptation."

In Chadwick v. United States, 141 Fed. 225, 245, 72 C. C. A. 343,
363, language was employed by the district attorney more inflamma-
tory and more subject to objection, we think, than the language used
by the counsel for the government in the case at bar.  In that case
the defendant objected and excepted, and no ruling was made by the
court.  Judge Lurton, for the Circuit Court of Appeals, in reviewing
the exception, held that there was no reversible error, and said:

"There is a degree of liberty allowable to counsel, whether for the govern-
ment or the accused, in respect to the line of argument they shall pursue
and the inferences to be drawn from the evidence, which a trial judge should
respect until the facts of the case are overstepped or arguments used which
plainly abuse the privilege. * * * But to entitle the accused to a re-
versal, when objection is made and the language not withdrawn, it must ap-
pear that the matter objected to was plainly unwarranted and so improper
as to be clearly injurious to the accused."

In Johnston v. United States, 154 Fed. 445, 83 C. C. A. 299, this
court in a similar case said:

"The use of language by counsel, calculated to prejudice a defendant and
not justified by the evidence, is improper and censurable, and should be dis-
countenanced by the court.  In such a case, it is the duty of the trial court

to set aside the verdict, unless satisfied that the improper language was not instrumental in securing it.  But invective based on the evidence and inferences legitimately to be derived therefrom are not inhibited, and it is usually within the discretion of the trial court to determine whether or not the limits of professional propriety have been exceeded.  Ordinarily the exercise of that discretion will not be reviewed in an appellate court, unless the invective is so palpably improper that it may be seen to have been clearly injurious."

We discover nothing so offensive or inflammatory in the remarks of counsel for the government as to require us on that ground to reverse the judgments.  The trial judge, in the exercise of the discretion vested in him, did not regard the language of counsel as of sufficient importance to call for further interference or action on his part than as indicated in the above excerpts from the record, and therein, we think, there was no abuse of discretion.

[8] It is contended that the court in its instructions gave to the words "concubine" and "mistress" too wide and inclusive a meaning, and it is argued that the defendants, by transporting the women for the purpose of making them their concubines and mistresses, were not guilty of the offense defined in the act, and that the words "prostitution or debauchery, or any other immoral practice," do not include concubinage, and that the immorality denounced by the White Slave Traffic Act is only commercialized vice.  The federal decisions are against these contentions.  Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 43 L. R. A. (N. S.) 906, 57 L. Ed. 523, Ann. Cas.1913E, 905 ; Athanasaw v. United States, 227 U. S. 326, 33 Sup. Ct. 285, 57 L. Ed. 528, Ann. Cas. 1913E, 911 ; United States v. Bitty, 208 U. S. 393, 28 Sup. Ct. 396, 52 L. Ed. 543 ; United States v. Flaspoller (D. C.) 205 Fed. 1006 ; Johnson v. United States, 215 Fed. 679, 131 C. C. A. 613.

[9] It is assigned as error that the court refused to instruct, as requested by the defendants, that in considering the testimony of Marsha Warrington, and the weight to be given thereto, they might consider her motive in testifying, "whether or not she has been or appears to be, acting under the influence of any person or persons, whether or not any promise of immunity has been offered to her, and any hope she may have for leniency in any criminal action brought against herself."  It is sufficient in answer to this assignment to point to the fact that there is in the record no evidence tending in any way to show that there had been a promise of immunity to Marsha Warrington, or that she was acting under the influence of any person or persons.

[10] It is urged that there was no evidence on which to find that Caminetti took any part in transporting the girls from Sacramento to Reno, but that, on the other hand, the evidence was that the tickets were purchased by Diggs alone.  The record does not sustain this contention.  There are many items of the testimony which show that the journey to Reno was the result of the preconcerted action of both Diggs and Caminetti, and with a view to achieve a common purpose, which was, in fact, accomplished.  Thus Lola Norris testified that, on the afternoon of the day on which they started for Reno, the four were together in a box at a restaurant, and that:

"When we agreed on Reno, just before Mr. Caminetti left, he gave me $20. I don't know whether he wanted me to buy my own, or buy my own and Miss Warrington's together."

Again she testified that on the same occasion Diggs said:

"Some one would have to manage the party, and the others would have to abide by his decisions. And so Mr. Caminetti said, 'I will make you the boss,' and so Mr. Diggs took charge of the party. Mr. Caminetti and Mr. Diggs were to share the expenses."

She testified that thereafter Caminetti left in search for money with which to pay for the trip, and that on his return—

"he said he had been having quite a time trying to locate the party who was to give him the money, but he finally succeeded in finding him, and he secured the money, and we all went down to the depot again. We reached the depot about 15 minutes before the train left, I think. Mr. Diggs went to the ticket office and bought the tickets."

She testified, also, that while Diggs was buying the tickets Caminetti—

"just stood there with us. * * * I heard no objection made by Caminetti to the suggestion of Mr. Diggs that he purchase the tickets."

There was testimony that Caminetti and Diggs together rented the bungalow in Reno which was occupied by the party, and that while there he ordered and paid for groceries to be sent to the bungalow. In view of these features of the evidence, and others not necessary to recount, the court below properly instructed the jury as follows:

"As to the question which has been argued by counsel whether the evidence is sufficient to show that the defendant transported, or aided or assisted in transporting, these girls to Reno, you will understand that it is not necessary, to sustain this charge, that the defendant be shown to have himself paid for the tickets or other expenses of that trip. If he contributed to the means of paying such expenses, or if it was understood between himself and Diggs that he was thereafter to contribute thereto by reimbursing Diggs, this would be sufficient on which to sustain the charge that the defendant aided and assisted in such transportation."

[11] It is contended that the instructions to the jury were erroneous, in that thereby the jury were led to believe that the defendants were merely charged with seducing the women named in the indictment, and that, if the jury so found, they might find the defendants guilty. This contention is not sustained by the record. It appears therefrom that the court read to the jury the indictment, in which it was charged that each defendant transported and caused to be transported the two girls named "for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become the concubine and the mistress of the said defendant," and in which the same allegation was made as to Lola Norris   The court also read the statute and explained the meaning of its terms, and, among other things, charged the jury that if they found that these girls were taken to Reno on the occasion in question, as testified to by them, and that while there the defendant Diggs and his companion, Caminetti, cohabited with them as the testimony tends to show, "then you may find that they were taken there with the immoral purpose and intent

charged." In the instructions the court defined the terms "concubine" and "mistress" and the term "debauchery" as used in the statute; and it is clear from the whole of the instructions that the jury must have fully understood the nature of the charges against each defendant.

Since writing the above our attention has been directed to the recent decision of the Circuit Court of Appeals for the First Circuit, in Myrick v. United States, 219 Fed. 1, in which the majority of that court, Judge Putnam dissenting, reversed the judgment of the District Court and followed the rule announced in Balliet v United States, 129 Fed. 689, 64 C. C. A. 201, above cited. In the majority opinion in that case reference is made to the fact "that the question has not been definitely decided by the Supreme Court." We still entertain the opinion, however, that the language of the statute and the utterances of the Supreme Court which we have cited are sufficiently broad and inclusive to justify the view which we have taken of the effect of the act of March 16, 1878. In this day of enlightened jurisprudence it is believed that the protection against self-incrimination conserved by the fifth amendment is to be classed with other bars which the rules of the common law placed against the admission of evidence of the truth, as to which, said Judge Dillon in State v Gigher, 23 Iowa, 318, "the tendency of modern legislation and modern decision is to remove these bars and to let in the light." But protection against self-incrimination is still afforded in the provision that the defendant may or may not testify for himself as he may elect. We think that when he elects to become a witness he waives his constitutional privilege against self-incrimination, and that the true rule is stated in Wigmore on Evidence, § 2276 (2):

"The case of an accused in a criminal trial, who voluntarily takes the stand, is different. Here his privilege has protected him from being asked even a single question, for the reason that no relevant fact that could be inquired about would not tend to incriminate him. On this very hypothesis, then, his voluntary offer of testimony upon any fact is a waiver as to all other relevant facts because of the necessary connection between all.".

And (2) (d):

"The subject of the direct examination, properly construed, is the whole fact of guilt or innocence, and hence the topic of cross-examination might always range over any relevant facts, except those merely affecting credibility."

There are numerous other assignments of error, which we have carefully considered, but in none of them do we find ground for reversing either of the judgments.

Finding no error, the judgments are affirmed.

WOLVERTON, District Judge (concurring). I am constrained, by reason of the importance of the cases under consideration, to set forth my views particularly touching the instructions of the trial court relative to the failure of the defendants, if such were the case, to deny or explain acts of an incriminating nature that the evidence of the pros-

ecution established against them, they having taken the witness stand in their own behalf. In order to a clear understanding of the view I entertain, it is essential that we get a comprehensive view of the situation. . . .

First, as to the Diggs case. Diggs was indicted by six counts. By the first, he is charged with transporting Marsha Warrington from Sacramento, in California, to Reno, in Nevada, for the purpose of debauchery, and for an immoral purpose, namely, that she should become his concubine and mistress; by the second, that he transported Lola Norris from and between the same points, that she might become the mistress and concubine of F. Drew Caminetti; by the third, that he (Diggs) procured a ticket for Marsha Warrington from Sacramento to Reno, with the intent and purpose that she should become his concubine and mistress; by the fourth, that he procured a ticket for Lola Norris, with the intent and purpose that she should give herself up to debauchery, and for an immoral purpose, to wit, that she should become the concubine and mistress of one F. Drew Caminetti; by the fifth, that he (Diggs) persuaded, induced and enticed Marsha Warrington to go from Sacramento to Reno for the purpose of debauchery, and for an immoral purpose, to wit, that she should become his concubine and mistress; and by the sixth, that Diggs persuaded and enticed Lola Norris to go from Sacramento to Reno for the purpose of becoming the concubine and mistress of F. Drew Caminetti. Diggs was convicted on the first four counts, and acquitted on the last two. The elements of the offenses charged are few and simple, and comprise the transportation, the buying of the tickets, the persuasion and inducement, and the purpose with which these things were done. All were the subject of inquiry at the trial.

The story of Marsha Warrington as a witness runs from her first meeting with Diggs in September, 1912, to the time that the four were apprehended and placed under arrest in Reno, Nev. She tells of her acts and demeanor with relation to Diggs, and of his acts and demeanor toward her, of improper relations with him from time to time, of a trip to San Francisco with Diggs, Caminetti, and Miss Norris during the month of February, 1913, of Diggs' registering under a fictitious name with her as man and wife, of occupying the same room with him at the hotel during the night, of their going on to San Jose, where they were again registered as man and wife, and occupied the same room in the hotel for another night, of the party of the four who met at the house of Diggs in the absence of his wife in January before the Reno trip, and then in much detail the discussions between herself and Diggs, and the four of them, and what they did leading up to the final determination to go to Reno; also of what was done in procuring transportation, what was done on the way, and what was done in Reno. It was a connected story from the beginning to the end. In all material particulars she was corroborated by Lola Norris.

Maury I. Diggs, after the government had rested, took the stand as a witness in his own behalf. He narrated in great detail the history of his relations with Marsha Warrington, and the many troubles that came to him from their acts and conduct prior to the Reno trip, and also of the relationship existing between Caminetti and Lola Norris,

and of the relationship of the four, charging Marsha Warrington with having had improper relations with him at the time the four were met at Diggs' house in the absence of his wife, a thing that Marsha Warrington denied. Continuing, Diggs dwelt at length upon the discussions had, and what happened between him and Marsha Warrington, and among the four of them, relative to his and Caminetti's leaving Sacramento for a while, owing to the reports of scandal that had arisen and the trouble in which they were involved. He relates that the first conversation he had with Marsha Warrington with respect to his leaving the city was on the Southern Pacific levee. This was two weeks and one day before March 9th, the Reno trip having been entered upon on the 10th. Then he tells of other conversations had with her, and with Caminetti and Lola Norris, relative to his and Caminetti's leaving the city for a while to escape the odium that was threatening if they remained. One conversation he specifies as having taken place while they were on an automobile ride, when he suspected they were being followed; another during the last week, ending March 9th, at the Columbia Hotel, in Sacramento, where Diggs was in hiding, he having called Marsha Warrington up and advised her of his whereabouts; another he names as having taken place at the Peerless Restaurant. This was on Saturday. He says:

"Then there was another conversation Sunday afternoon. That was out at Twenty-Eighth and J street. I believe I had called Miss Warrington up and made an appointment to meet her out there at the Park. That was relative to my going away. I still maintained that I was going South to get away from all this trouble. Miss Warrington said, 'Well, I have thoroughly made up my mind I am going, too. I am going with you.' * * * The proposition was thoroughly settled right there, that we were going to get out of town. We had not talked at that time of exactly where we would go, or anything of the kind; but I was very much of the opinion that I wanted to go to Los Angeles, owing to the fact that I had a lot of friends there that had lived there, and thought for a week or so I could have a good time down there, and come back home, and everything would be all right. I did not intend to take the girls. I did not care whether they went with me or went alone. In fact, I wanted Miss Warrington to stay. * * * After leaving Miss Warrington and Miss Norris in the Park, Miss Warrington had prevailed upon Miss Norris that she should go with her, and the girls said that we would meet at the Saddle Rock Restaurant at 8 o'clock. So I early made up my mind that I was going to leave town, and I agreed to meet them there."

From there he went home to his wife. He continues with his story:

"After I got in my house I thoroughly made up my mind to go and see my father and ditch the appointment with the girls, and not see them any more, and take a chance on the whole business. I told my wife good-by. * * * Mr. Hamilton rode as far as Eighth and J, and got off the car, and I went to the depot with the full intention of going on that train and coming to Berkeley and seeing my father. I missed the train by 5 minutes, owing to the fact that I had stopped at the office to get the suit. The car did not get me there in time. I turned around and came back and went to the restaurant. The girls were not there. I went to the cigar store next door and shook dice for cigars, the 'twenty-six' game. In a few minutes, a little after 8 o'clock, I believe, the girls showed up. * * * In the meantime Mr. Caminetti showed up on the scene. He was pretty much under the influence of liquor. He says, 'Well, what is doing?' I said, 'Well, I am going, and the girls say they are going, too.' He said, 'Where are you going?' I said, 'I don't know; anything to get out of town for a while.' He said, 'Well, I haven't got any money; I will go down town and get some,' which he did."

Here Diggs relates that he went out and made inquiry as to the time of departure of all trains leaving Sacramento that night. Then he continues:

"So the thing came up; the next train leaving town was 10:45, the eastbound train, and we all agreed to catch that train. I called Mr. Caminetti up on the telephone again. * * * He did not show up for that train. Miss Warrington and Miss Norris and I went over to the depot. When the train got ready to go, I thoroughly made up my mind between the restaurant and the depot that I did not care who went, or who was ready to go, or anything else; if the crowd was not ready to go, I was going alone; I was going to get out of town. Mr. Caminetti did not appear. Miss Norris, I believe, stayed in the little car house, the street car station at the end of the line, at the depot. Miss Warrington walked over to the Southern Pacific Station with me, and the train stopped. We were contemplating about taking it. Marsha said to me, 'Now,' she said, 'You go on and take the train; if your wife is wise to me, I am scared to death; I am afraid she will cause you harm or trouble, or have you arrested, and you better get out of here.' I was contemplating in my own mind whether to take the train or not. Then I believe I said to Marsha, 'No, I will not take that train.' I said, 'If there is going to be any staying here, I am no piker, and I will stay here and face this whole thing with the rest of you; I am not going to go away and leave you here.' Then we went back to the restaurant. Mr. Caminetti did not appear, so we went back to the restaurant. * * * We all talked over again the serious condition that we were in and where we would go. There was no specific place mentioned at the time during the conversation as to where we would go; no terminal point at all. We merely talked over different routes and different lines and different times of arrivals of different trains going out of Sacramento to the different places. There was no positive terminal settled upon at all. That is about all that occurred there. At this time Caminetti had not got back yet. In nearly every conversation we had, when we spoke of our conditions and the probable arrest of us—us boys, I mean—Marsha or Lola, either one, invariably would ask, 'What will they do to us? What will happen to us if these things come out?' From our meager knowledge of the law, we explained to them as near as we could what would happen if anybody chose to press them, and they thereupon would ask, 'Who will press us?' I cannot remember all the questions they asked, but Miss Warrington asked me what my wife could do to her if she knew she was keeping company with me; and I told her that, owing to the fact that she was not 21, I thought— I said I was not straight on the Juvenile Law, but I believed she could institute proceedings against her through the Juvenile Court if she wanted to. I also told her that if she had any money my wife could sue her for alienation of her husband's affections. That was told her upon her request as to what would happen to her."

Thus ended the examination in chief of Diggs, testifying in his own behalf.

The testimony of the government shows, and it is not disputed, that the four took the train later on the same night for Reno. On cross-examination Diggs says: "We left for Reno two weeks after meeting her on the levee." And again he says, referring to a ride about town: "That was one week before we left for Reno." Further on he was asked: "In your testimony you have referred repeatedly to conversations and events that took place before the Reno trip. Now, what did you understand to mean by the Reno trip?" To which he answered, over objections: "It is perfectly evident what trip it was." And so it was, without question.

Now, the purpose of the defense in offering the testimony of Diggs to the point where he terminated it was threefold: First, to show that there was no persuasion or inducement on his part, causing the girls to

go on the trip; second, to discredit the girls; and, third, to shade the purpose for which the girls were taken or went upon the trip. This comprehends practically the whole case, except the fact of the purchase of the tickets and the transportation from Sacramento to Reno. And yet these latter are so conjoined in time and circumstance with the former that there is no discernible line of cleavage whereby the testimony touching the one set of facts may be cut off from its relation to the other.

I am firmly persuaded that the defendant, having taken the stand and offered his testimony upon the merits of his case, and having entered into it in part, rendered himself amenable to cross-examination as to the whole, and, further, when he sought to show that the girls went upon the journey of their own free will and accord, without persuasion and inducement upon his part, then that his acts and demeanor at the time of leaving, including the purchase of tickets, and while upon the trip and at Reno, became subjects of perfectly legitimate inquiry to test the accuracy of his own rendition of how they all came to go upon the same journey. A defendant cannot tell a half story touching his defense, which is a half story from his standpoint of the merits of the case, then abruptly stop in his course and decline to answer further, and expect to reap the benefit for himself to be derived therefrom, without incurring the discredit that is, by the rules of evidence and legal inference, visited upon the ordinary witness pursuing a like course. Mr. Wigmore, in his work on Evidence (volume 4, § 2276, subd. 2), states the rule very succinctly which I think is applicable in the present case. After having discussed the rule applicable in the case of an ordinary witness, he says:

"The case of an accused in a criminal trial, who voluntarily takes the stand, is different. Here his privilege has protected him from being asked even a single question, for the reason that no relevant fact that could be inquired about would not tend to criminate him. On this very hypothesis, then, his voluntary offer of testimony upon any fact is a waiver as to all other relevant facts, because of the necessary connection between all. His situation is distinct from that of the ordinary witness, with reference to the point of time when a waiver can be predicated, because the ordinary witness is compelled to take the stand in the first instance, and his opportunity for choice does not come till later, when some part of the criminating fact is asked for, while the accused has the choice at the outset. From the point of view of the actual prescience of witness and accused, the result is the same. Each knows well enough that the inquiries will be upon topics relevant to the charge in issue; but that is immaterial. The question is: What does he know as to the connection between the first question and a possible subsequent incriminating question? Now, the accused knows that there must always be such a connection, and, if there is not, then his answer cannot be a waiver. The result is, then, that the accused, as to all facts whatever (except those which merely impeach his credit, and therefore are not related to the charge in issue), has signified his waiver by the initial act of taking the stand."

Further on he says (subdivision "d"):

"The subject of the direct examination, properly construed, is the whole fact of guilt or innocence, and hence the topic of cross-examination might always range over any relevant facts except those merely affecting credibility."

So it is said, in State v. Wentworth, 65 Me. 234, 243 (20 Am. Rep. 688):

"If he [defendant] discloses part, he must disclose the whole in relation to the subject-matter about which he has answered in part. * * * Answering truly in part with answers exonerative, he cannot stop midway, but must proceed, though his further answers may be self-incriminative. Answering falsely as to the subject-matter, he is not to be exempt from cross-examination because his answers to such cross-examination would tend to show the falsity of those given on direct examination. If it were so, a preference would be accorded to falsehood rather than to truth."

And again it is said, in State v. Ober, 52 N. H. 459, 13 Am. Rep. 88:

"Having testified concerning a part of the transaction, in which it was alleged that he was criminally concerned, without claiming his constitutional privilege, it was too late for him to halt at that point which suited his own convenience."

See, also, Connors v. People, 50 N. Y. 240; Stover v. People, 56 N. Y. 315; Heldt v. State, 20 Neb. 492, 30 N. W. 626, 57 Am. Rep. 835; Lee v. State, 56 Ark. 4, 19 S. W. 16; Clarke v. State, 78 Ala. 474, 56 Am. Rep. 45; State v. Tatman, 59 Iowa, 471, 13 N. W. 632; State v. Larkin, 250 Mo. 218, 157 S. W. 600, 46 L. R. A. (N. S.) 13; State v. Raftery, 252 Mo. 72, 158 S. W. 585.

The Supreme Court has enunciated the same principle, while perhaps not deciding the exact question here involved. In Fitzpatrick v. United States, 178 U. S. 304, 315, 20 Sup. Ct. 944, 948 (44 L. Ed. 1078), the court says:

"Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf, and makes his own statement, it is clear that the prosecution has a right to cross-examine him upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor, without laying himself open to a cross-examination upon those facts. The witness having sworn to an alibi, it was perfectly competent for the government to cross-examine him as to every fact which had a bearing upon his whereabouts upon the night of the murder, and as to what he did and the persons with whom he associated that night. Indeed, we know of no reason why an accused person, who takes the stand as a witness, should not be subject to cross-examination as other witnesses are."

In this case reference is made to State v. Lurch, 12 Or. 99, 6 Pac. 408, and State v. Saunders, 14 Or. 300, 12 Pac. 441. But these cases fall clearly within the exception noted by Mr. Wigmore. The Oregon statute seems to limit the right of cross-examination to "all facts to which he [defendant] has testified." Sess. Laws 1880, p. 28.

In Sawyer v. United States, 202 U. S. 150, 165, 26 Sup. Ct. 575, 579 (50 L. Ed. 972, 6 Ann. Cas. 269), the court seems to have interpreted the rule slightly more broadly than was announced in the Fitzpatrick Case. It says:

"It has been held in this court that a prisoner who takes the stand in his own behalf waives his constitutional privilege of silence, and that the prosecution has the right to cross-examine him upon his evidence in chief, with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the crime."

And again, in Powers v. United States, 223 U. S. 303, 315, 32 Sup. Ct. 281, 284 (56 L. Ed. 448), the court says:

"Having taken the stand in his own behalf, and given the testimony above recited, tending to show that he was not guilty of the offense charged, he was required to submit to cross-examination, as any other witness in the case would be, concerning matter pertinent to the examination in chief."

These cases, it would seem, in principle, decide practically the very, point in issue here. When it is once ascertained that the inquiry touching what was done at the depot on the night and at the time the four left for Reno, and what took place on the journey, and what happened at Reno, was proper and legitimate subject-matter for the cross-examination of Diggs, it follows with absolute persuasion that the court's instruction complained of was not error for which a reversal should be had.

The case of Balliet v. United States, 129 Fed. 689, 64 C. C. A. 201, would seem to be opposed to this view, but we are not advised respecting the testimony offered in chief, and are without light as to the precise relation which the inferences sought to be drawn bear to the matter testified to. Sanborn, Circuit Judge, in his concurring opinion, has this to say on the subject:

"But in the federal courts the line of demarcation which limits a rightful cross-examination is clear and well-defined. It is the line between subjects relative to which the witness was examined upon the direct examination and those concerning which he was not required to testify."

It may be that the defendant might be called to testify to some collateral fact—that is, as to some matter distinct from the real merits of the case and yet having some pertinent bearing—and not be subject to cross-examination as to the merits; as, for instance, if a defendant in a murder case were called to testify merely whether or not he was related to the deceased. In such a case it would be a strange stretch of the rule to hold that he could be cross-examined as to whether he committed the murder. But where a defendant has taken the stand, and has once entered upon a disclosure or a recital of part of the details relating to the offense charged, the offense charged becomes the subject-matter of the inquiry in chief, and the defendant subjects himself to cross-examination touching the entire subject-matter. And this is my position in the present case. With all due respect for the court deciding the Balliet Case, I am unable to adopt its conclusion.

In the very recent case of Myrick v. United States, 219 Fed. 1, the court was of the opinion:

"That the defendant Cunningham, by taking the stand and testifying as to the commissions paid to agents, did not waive his constitutional right to be free from unfavorable comment on matters to which his testimony did not relate, and as to which he said nothing."

This case I do not regard as opposed to the view here entertained.

I have discussed in particular the Diggs case. But the facts of the Caminetti case, although Caminetti did not go so minutely into the previous relationship existing between him and Diggs with Lola Norris and Marsha Warrington, bring it within the same principle, and the same conclusion would follow, Caminetti's especial purpose in testifying was to show the particular motive which induced him to embark upon the expedition.

Upon all other questions in the case, I concur with the views expressed by Judge GILBERT in the prevailing opinion.

ROSS, Circuit Judge (dissenting). These are companion cases, the respective plaintiffs in error being companions in the transactions out of which the cases arose. The record and arguments in each case are much alike, and therefore the cases may be properly and conveniently disposed of together.

The party defendant in the first case tried in the court below—Diggs—was at the times in question about 26 years old, residing with his wife and one child in the city of Sacramento, where, according to the evidence he was somewhat prominent as an architect and otherwise.

The defendant in the other case—Caminetti—was about two years younger, and had a wife and two children with whom he resided in the same city, and where he occupied an official position of some consequence, and was also a man of some prominence. The two were close friends. Two girls, named respectively Marsha Warrington and Lola Norris, were at the same time living in the same city—the first mentioned with her father and stepmother, and the second with her parents, all of whom were respectable people.

In both cases there was testimony given tending to show that several weeks before the commission of the acts which constitute the basis of the indictments a saloon keeper named Austin, who was an intimate friend of Diggs, and also a friend of Miss Warrington, introduced the two on a street in Sacramento. Miss Warrington was then about 20 years old and a stenographer; Lola Norris, about a year younger, was her intimate friend. The result was that these four persons almost immediately commenced going about together frequently, often to disreputable places, at different times Diggs taking the four in his machine on trips about the city and to outside places, where they sometimes spent the night; he registering under an assumed name with Marsha Warrington as his wife, and Caminetti under an assumed name with Lola Norris as his wife, in each instance where the night was spent away from home the girls deceiving their respective parents by false representations as to where they were going.

The two girls were the chief witnesses against the defendants on their trials. Marsha Warrington herself testified to her seduction by Diggs and that she had become pregnant by him prior to the trip to Reno, Nev., upon which trip the indictments are founded. Lola Norris testified that Caminetti had not accomplished his diabolical purpose prior to their arrival in Reno, although she admitted that she had spent the night with him on at least one of the trips out of Sacramento to near-by places, and had occupied the same bed with him in the drawing room of a Pullman car on the trip to Reno; Diggs and Miss Warrington occupying the other bed in the same drawing room.

There was evidence tending to show that prior to the Reno trip the conduct of these four persons had become more or less known in Sacramento and a subject of comment there, and that publicity as well as court proceedings became imminent before the four departed from Sacramento for Reno, Nev., from which latter place they were brought

back by officers of the law after having spent several days and nights in Reno in a cottage which the men had rented under assumed names. and where Diggs lived with Miss Warrington as husband and wife. and where Caminetti maintained the same pretended relationship with Miss Norris.

Subsequently the indictments in the present cases were presented and filed—that against Diggs containing six counts, and the one against Caminetti four counts.

In the Diggs case the first count is, in substance, that on the 15th day of January, 1913, at Sacramento, the defendant did willfully, knowingly, feloniously, and unlawfully transport and cause to be transported, and aid and assist in obtaining transportation for, Marsha Warrington from Sacramento, Cal., to Reno, Nev., over the line of the Southern Pacific Company, a railroad corporation engaged in carrying passengers from one state to the other, "for the purpose of debauchery and for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become the concubine and the mistress of the said defendant."

The second count contains like averments in respect to Lola Norris "for the purpose of debauchery and for an immoral purpose, to wit, that the aforesaid Lola Norris should be and become the concubine and the mistress of one F. Drew Caminetti."

The third count charges that the defendant on the 15th day of January, 1913, at Sacramento, did willfully, unlawfully, and feloniously, knowingly procure and obtain, and cause to be procured and obtained, and aid and assist in procuring and obtaining, a ticket issued by the Southern Pacific Company at its office in the city of Sacramento for passage between that city and Reno, in the state of Nevada, to be used by Marsha Warrington, in interstate commerce, in traveling from Sacramento to Reno over the line of the Southern Pacific Company, a common carrier engaged in the business of carrying passengers between the points named, whereby the said girl was then and there so transported, "with the intent and purpose on the part of the said defendant that said girl, Marsha Warrington, should give herself up to debauchery and for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become the concubine and the mistress of the said defendant."

The fourth count contains substantially the same averments as the third, except as to the name of the girl; Lola Norris being therein named, instead of Marsha Warrington, and excepting the intent with which such transportation of Lola Norris is alleged to have been made, the same being, as alleged in the second count, "with the intent and purpose on the part of the said defendant that said girl, Lola Norris, should give herself up to debauchery and for an immoral purpose, to wit, that the aforesaid Lola Norris should be and become the concubine and the mistress of one F. Drew Caminetti."

The fifth count alleges that on the same day and year, at Sacramento, the defendant did willfully, unlawfully, and feloniously, knowingly persuade, induce, and entice, and cause to be persuaded, induced, and enticed, and aid and assist in persuading, inducing, and enticing, Marsha

Warrington to go from Sacramento, Cal., to Reno, Nev., in interstate commerce over the line of railroad of the Southern Pacific Company, "for the purpose of debauchery and for an immoral purpose, to wit, that she, the said Marsha Warrington, should be and become the concubine and the mistress of the said defendant."

The sixth count makes substantially the same allegations as the fifth, except in respect to the girl named; Lola Norris being therein named, instead of Marsha Warrington, and except in respect to the intent, which is therein charged to be "for the purpose of debauchery and for an immoral purpose, to wit, that she, the said Lola Norris, should be and become the concubine and the mistress of one F. Drew Caminetti."

Under that indictment Diggs was found guilty as charged in the first four counts, upon which conviction the judgment against him is based; the jury returning no verdict in respect to the last two counts of the indictment, and no further action by the court in respect thereto appearing to have been taken.

In the Caminetti case the first count charges, in substance, that on the 15th day of January, 1913, at Sacramento, Cal., the defendant did willfully, knowingly, and feloniously, unlawfully transport and cause to be transported, and aid and assist in obtaining transportation for, and in transporting in interstate commerce, from Sacramento to Reno, Nev., over the line of railroad of the Southern Pacific Company, a common carrier engaged in carrying passengers between the two cities named, a certain girl, to wit, one Lola Norris, "for the purpose of debauchery and for an immoral purpose, to wit, that the aforesaid Lola Norris should be and become the concubine and the mistress of the said defendant."

The second count contains substantially the same averments as the first, except that Marsha Warrington is therein named, instead of Lola Norris, and except as to the intent, which is therein charged to be "for the purpose of debauchery and for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become the concubine and the mistress of one Maury I. Diggs."

The third count charges, in substance, that the defendant on the day and year already mentioned, at Sacramento, did willfully, unlawfully, and feloniously, knowingly, persuade, induce, and entice, and cause to be persuaded, induced, and enticed, and aid and assist in persuading, inducing, and enticing, Lola Norris to go from the city of Sacramento, Cal., to Reno, Nev., in interstate commerce over the line of railroad of the Southern Pacific Company, a common carrier of passengers between the points named, "for the purpose of debauchery and for an immoral purpose, to wit, that she, the said Lola Norris, should be and become the concubine and the mistress of the said defendant."

The fourth count makes substantially the same charges as the third count, except as to the girl, who is therein alleged to be Marsha Warrington, and in respect to the intent, which is therein alleged to be "for the purpose of debauchery and for an immoral purpose, to wit, that she, the said Marsha Warrington, should be and become the concubine and the mistress of one Maury I. Diggs."

Under that indictment Caminetti was found by the jury guilty as

charged in the first count, and not guilty upon each of the other counts, upon which verdict the judgment against him is based.

In each case the distinct and specific purpose alleged in the indictment in the alleged acts of the defendant, as respects Marsha Warrington, was that she "should be and become the concubine and the mistress of" Diggs, and, as respects Lola Norris, that she "should be and become the concubine and the mistress of" Caminetti.

However depraved and heinous the conduct of the two men was, yet, when brought before the court upon indictment, the same legal presumption of innocence of the offenses charged attended them that accompanies every other person legally charged with crime, and the same obligation rested upon the prosecution to establish their guilt by legal proof beyond a reasonable doubt that arises in the case of every other person legally accused of crime—the ultimate determination of the facts resting, as in every criminal case, with the jury, rightly instructed by the court as to the law governing the case.

In each of the present cases a large amount of evidence was introduced and many incriminating facts and circumstances testified to. Witnesses were sworn and testified on both sides. In the Diggs case that defendant was sworn on his own behalf and testified at length concerning his relations with Miss Warrington, and concerning the actions and relations of all four of the persons here under consideration, prior to their departure from Sacramento on the Reno trip; but in respect to their actions and relations on that trip, and while remaining in Reno, he neither testified nor was questioned, either on direct or cross-examination. In respect to all of those matters he chose to remain silent; and one of the principal questions in the Diggs case relates to the instruction given by the trial court to the jury respecting his silence in that regard.

On the part of the prosecution the actions and relations of the parties on the Reno trip and during the time they remained in that city was fully gone into, and much evidence was also given by the government tending to show that the two girls were persuaded and induced by the two men to go with them on that trip, although the testimony given by Diggs in his own behalf, if believed by the jury to be true, directly tended to show that there was no inducement or persuasion on the part of the men, but, on the contrary, that the girls went with them willingly, and, as to Miss Warrington, insistently.

Among the details of the trip and the stay of the four in Reno was the following testimony of the two young women introduced on behalf of the prosecution: That they left Sacramento for Reno the night of March 9, 1913, is undisputed. Among other things, Miss Warrington testified:

"After Mr. Diggs, Miss Norris, and myself reached the depot, the train came in, and I told Mr. Diggs to go on and take the train, and that I was perfectly willing to stay in Sacramento and would not go with him. He said, 'No;' that he wanted me to go."

Caminetti not having been in time for that train, Diggs reached him by telephone and arranged a further meeting of the party with Cami-

netti at the Saddle Rock restaurant, concerning which meeting Miss Warrington further testified:

"When Mr. Caminetti reached there, he said he had some money and that he would go on the next train. We then left the Saddle Rock and went to the depot, reaching it about 12 o'clock. Mr. Diggs said for us to wait and he would get the tickets; we waited, and he got the tickets at the ticket office in the depot. I waited with Mr. Caminetti and Miss Norris; then the train came and we got on. It was an ordinary Pullman car, and Mr. Diggs got a drawing room from the Pullman conductor and he paid for it. We waited until it was made up, then the four of us entered. Mr. Diggs, I think, ordered the porter to make up the· drawing room. There were three beds—the upper and lower berths and a little side bed. We all went to bed right after we entered the room. Miss Norris and Mr. Caminetti had the upper berth, and Mr. Diggs and I had the lower berth. Miss Norris got in the upper berth two or three minutes after we entered the room. I think she got her clothes off ·up there, her shoes, her skirt, and her waist and her hat. Mr. Caminetti got in the berth the same time she did. I think he took his clothing off up there. I got in the lower berth first. Before getting into it I took off my skirt and waist and pumps. Mr. Diggs took off his shoes and coat, and I think he took off his trousers and his outer shirt. * * * I saw Mr. Diggs give the tickets to the conductor."

Miss Norris, also sworn on behalf of the prosecution, gave similar testimony to that of Miss Warrington just quoted, and in the course of her testimony said, among other things:

"We reached Reno about 8 or 9 ₒo'clock next morning."

And again:

"I recall when the train reached Truckee. We arose about an hour and a half before the train reached Reno. Upon our arising in the morning, Mr. Diggs said that they would get a cottage when we got into Reno. All four of us were to live in the cottage."

Referring to the time of reaching Reno, Miss Warrington also testified:

"I remained in the berth with the defendant Diggs until about 8 o'clock the next morning, I think. Mr. Diggs got out first. Mr. Caminetti, I think, got out of the upper berth first. I recall reaching Reno that morning. It was before noon, I think; the first place we went was to a café to have our lunch. * * * Then Mr. Diggs and Mr. Caminetti went to the real estate firm, I think."

In respect to the meeting at the Saddle Rock restaurant Miss Norris also testified:

"At the Saddle Rock restaurant, just before leaving, Mr. Caminetti gave me some money and told me to buy my own ticket to Reno. Mr. Diggs saw him give it to me, and he said that he would buy all the tickets; that it would never do for us to separate, and for Miss Warrington and I to go together, and they go together, away from us. And he said— We had been talking about places to go, and they had suggested several places, and Mr. Diggs said it would not do for every one to have suggestions; that each one, of course, thought his was the best, and that some one would have to manage the affair; somebody would have to be the boss; 'Now who will it be;' and Mr. Caminetti said, ' Well, I name you to be the person to manage the trip;' and so he considered himself the boss."

The party left Sacramento shortly after midnight of March 9, 1913, by the Southern Pacific Railroad. On their arrival in Reno the next

morning they at first went to the Riverside Hotel, concerning which Miss Warrington testified:

"They said we should go to the hotel and wait for them, and they would try and rent a house for one month at least. I think they said they were going to stay in Nevada about six months. * * * They told us that when we reached the Riverside Hotel we should wait there until they returned. They returned about 5 o'clock. Then they registered, after which we went upstairs to the suite of three rooms, two bedrooms, with a sitting room between. We occupied these rooms just one night, and left about 9:30, I think, next morning. Mr. Caminetti and Miss Norris had one, and Mr. Diggs and I had the other room. We retired about 10:00 o'clock. We all discarded our wearing apparel. Mr. Diggs occupied the bed with me, and Miss Norris occupied the other bed with Mr. Caminetti."

And concerning which Miss Norris testified:

"Mr. Diggs and Mr. Caminetti went over to the clerk's desk in the office of the hotel and reserved three rooms, a suite of rooms. Mr. Diggs told us that he registered as Mr. Enright and wife, and Mr. Caminetti registered as Mr. Ross. * * * There were three rooms, two bedrooms and a sitting room. Mr. Caminetti and I occupied one, and Mr. Diggs and Miss Warrington the other. I discarded most of my wearing apparel that night."

On the day of the arrival of the party in Reno the men rented from a man named Mergen, acting for a firm of real estate agents there, a cottage, concerning which transaction Mergen testified on behalf of the prosecution:

"I recall negotiating with Mr. Enright on the 10th, of March, 1913, for the renting of that cottage. * * * The name Enright was given me by himself. I would recognize the man again if I saw him in this courtroom. Q. Will you kindly look around and see if he is here? A. He is right there, with his hand up to his face.

"Mr. Roche: You will concede, gentlemen, that that is the defendant.

"Mr. Devlin. Yes."

And in respect to the stay and actions of the parties in question while in Reno Miss Norris further testified:

"I knew that Mr. Caminetti went by the name of Ross at Reno, and that I was going by the name of Mrs. Ross, and that Mr. Diggs and Miss Warrington were going by the name of Enright and wife. * * * Mr. Diggs and Miss Warrington occupied the front bedroom, and Mr. Caminetti and I the back bedroom. Mr. Caminetti and I had sexual intercourse in that bungalow. He said he would marry me, and I believed him."

And Miss Warrington also testified:

"While at Reno I had sexual relations with Mr. Diggs."

Upon the conclusion of all of the evidence in the Diggs case, the court, after argument by the attorneys of the respective parties, instructed the jury, giving, among other instructions, this in respect to the defendant:

"The defendant has taken the stand in his own behalf, and, so far as his testimony tends to cover the transaction involved in the charges against him, it is somewhat at variance with that of the two girls, Miss Warrington and Miss Norris; that is, according to his story of their intimacy, he makes it appear that Miss Warrington was apparently pursuing him as much as he was pursuing her, if not more, and he claims that when he suggested the idea of leaving Sacramento alone she protested that she should not be left behind, but should go with him, and that it was she, and not the defendant,

who insisted that Miss Norris should accompany them. Now this conflict, so far as it exists, is for you to determine; that is, you will say whether the statements of these girls are true, or that of the defendant, to the extent that you find it material to determine in order to reach your verdict. The testimony of the defendant, however, does not cover the entire transaction as testified to by the two girls and the other witnesses for the prosecution. After testifying to the relations between himself and Caminetti and these girls down to the Sunday night on which the evidence of the government tends to show the trip to Reno was taken, he stops short and has given none of the details or incidents of that trip, nor any direct statement of the intent or purpose with which that trip was taken, contenting himself by merely referring to it as having been taken, and by testifying to his state of mind for some days previous to the taking of that trip. Now this was the defendant's privilege, and, being a defendant, he could not be required to say more if he did not desire to do so; nor could he be cross-examined as to matters not covered by his direct testimony. But in passing upon the evidence in the case for the purpose of finding the facts you have a right to take this omission of the defendant into consideration. A defendant is not required under the law to take the witness stand. He cannot be compelled to testify at all, and if he fails to do so no inference unfavorable to him may be drawn from that fact, nor is the prosecution permitted in that case to comment unfavorably upon the defendant's silence; but where a defendant elects to go upon the witness stand and testify, he then subjects himself to the same rule as that applying to any other witness, and if he has failed to deny or explain acts of an incriminating nature that the evidence of the prosecution tends to establish against him, such failure may not only be commented upon, but may be considered by the jury with all the other circumstances in reaching their conclusion as to his guilt or innocence, since it is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so."

It must be remembered that neither of the defendants to these cases was on trial for fornication or adultery. While both of those acts are made a crime and punishable as such by the laws of the state of California, neither is made a crime by any law of the United States. The statute of the United States upon which the present prosecutions are based is the act of June 25, 1910 (36 Stat. 825, c. 395), which the act itself expressly declares "shall be known and referred to as the White Slave Traffic Act,'" the second, third, and fourth sections of which are as follows:

"Sec. 2. That any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any territory or in the District of Columbia, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or who shall knowingly procure or obtain, or cause to be procured or obtained, or aid or assist in procuring or obtaining, any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in any territory or the District of Columbia, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in any territory or the District of Columbia, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment of not more than five years, or by both such fine and imprisonment, in the discretion of the court.

"Sec. 3. That any person who shall knowingly persuade, induce, entice, or coerce, or cause to be persuaded, induced, enticed, or coerced, or aid or assist in persuading, inducing, enticing, or coercing any woman or girl to go from one place to another in interstate or foreign commerce, or in any territory or the District of Columbia, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and who shall thereby knowingly cause or aid or assist in causing such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or any territory or the District of Columbia, shall be deemed guilty of a felony and on conviction thereof shall be punished by a fine of not more than five thousand dollars, or by imprisonment for a term not exceeding five years, or by both such fine and imprisonment, in the discretion of the court.

"Sec. 4. That any person who shall knowingly persuade, induce, entice, or coerce any woman or girl under the age of eighteen years from any state or territory or the District of Columbia to any other state or territory or the District of Columbia, with the purpose and intent to induce or coerce her, or that she shall be induced or coerced to engage in prostitution or debauchery, or any other immoral practice, and shall in furtherance of such purpose knowingly induce or cause her to go and to be carried or transported as a passenger in interstate commerce upon the line or route of any common carrier or carriers, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine of not more than ten thousand dollars, or by imprisonment for a term not exceeding ten years, or by both such fine and imprisonment, in the discretion of the court."

In each indictment the charges related only to the trip of the parties in question from Sacramento, Cal., to Reno, Nev., and to the acts and circumstances connected with and growing out of that trip. Those acts and circumstances are in part detailed by the testimony of the witnesses Marsha Warrington and Lola Norris above quoted, in respect to which the defendant neither testified nor was questioned on either his direct or cross-examination. In respect to those matters he chose to avail himself of the privilege conferred upon him by article 5 of the amendments to the Constitution of the United States, which reads:

"No person * * * shall be compelled in any criminal case to be a witness against himself"

—and of the act of Congress of March 16, 1878 (20 Stat. 30, c. 37), which is as follows:

"That in the trial of all indictments, informations, complaints, and other proceedings against persons charged with the commission of crimes, offenses, and misdemeanors, in the United States court, territorial courts, and court-martial, and courts of inquiry, in any state or territory, including the District of Columbia, the person so charged shall, at his own request but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him."

To the extent that the defendant waived the immunity extended to him by the provisions of the Constitution and statute of the United States above quoted, he placed himself, as the court below properly told the jury, in the position of any other witness, and subjected his testimony to comment, by both counsel and court, to the same extent as may be properly and legally made by either respecting the testimony of any other witness. Authorities to that effect are very numerous, and

many of them are referred to by the respective counsel in the present cases. But such waiver does not, in my opinion, extend beyond the testimony given by the defendant, and the inferences and conclusions to be drawn therefrom, where he does not refuse to answer any proper question.

The counsel for the government have cited many authorities as to the proper limits to the cross-examination of a defendant in a criminal case who voluntarily goes on the stand as a witness, and as to the inferences to be drawn from his refusal to answer proper questions on cross-examination. But all such authorities are wholly inapplicable to the present cases for the reason that the direct examination of both defendants here was confined to matters occurring before the commencement of the Reno trip, and the only defendant who was cross-examined at all—Diggs—does not appear to have refused to answer any proper question. To hold that any inference or conclusion can be properly drawn from a failure of the defendant to explain or deny matters or circumstances concerning which he did not testify and concerning which he was not questioned, either on direct or cross-examination, would, in my opinion, manifestly be to make his silence in respect to such matters and circumstances evidence against him, contrary to the provisions of the Constitution and statute above quoted. And so the Circuit Court of Appeals for the Eighth Circuit in effect held in Balliet v. United States, 129 Fed. 689, 695, 64 C. C. A. 201, 207, where the court said:

"We have next to consider whether the jury were misdirected, and only one alleged error of this sort is called to our attention. At the conclusion of a somewhat lengthy charge, the trial judge made this statement, to which an exception was duly taken: 'It has been suggested that I have overlooked one thing. I may say you may consider, in determining the question, the fact that the defendant having gone upon the witness stand, if he has not fully explained, or has not explained matters which are material to the issues in this case, and which are naturally within his knowledge, you may consider that as a circumstance tending to show that the facts, if explained, etc., would bear out the contention of the government, and his failure to explain them or give a truthful explanation is against him.'

"We have not been able to conclude that this instruction states a correct rule of law, or that the giving of it was not a material error. As we interpret this instruction, it means that, inasmuch as the defendant had elected to testify in his own favor, if while on the stand he had not fully explained all matters and things material to the issues in the case which the jury might think were naturally within his knowledge, then the jury might conclude that the facts, etc., if he had indulged in an explanation concerning them, would have borne out the contention of the government (that is, shown that he was guilty), and that his failure to explain was against him (that is, would justify a conclusion of guilt). This rule of law would put the defendant in a criminal case in a peculiar attitude, for if he takes the stand as a witness he must perforce explain every fact and circumstance which has been put in evidence against him, as tending to establish guilt, which a jury may deem material, and such as he could explain, at the risk of having them conclude, because of his silence as respects such facts and circumstances, that they are true and that he is guilty. If a defendant in a criminal case desires to take the stand and contradict some particular fact or circumstance that has been testified to, he cannot safely do so for fear of raising a presumption of guilt by his failure to explain other facts and circumstances in evidence which the jury may happen to regard as material and may think the accused could explain. The federal statute (Act March 16, 1878, c. 37, 20 Stat. 30 [U. S. Comp. St. 1901, p. 660]) provides, in substance, that a person charged with an offense

'shall at his own request, but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him.' When the defendant in a criminal case, in compliance with this statute, waives his constitutional privilege by taking the witness stand, he occupies the attitude of any other witness, and may be cross-examined like an ordinary witness, and to the same extent. Fitzpatrick v. United States, 178 U. S. 304, 315, 20 Sup. Ct. 944, 44 L. Ed. 1078. The federal statute does not, like the statutes of some states (vide Rev. St. Mo. 1899, § 2637), expressly provide that the examination of the accused shall be limited to the matters testified to on his direct examination, but we apprehend that it should be so limited, because that is the general rule which obtains in the federal courts relative to the cross-examination of all witnesses except, when the rule is relaxed, as it sometimes is, on grounds of convenience or necessity. Houghton v. Jones, 1 Wall. 702, 706, 17 L. Ed. 503; Wills v. Russell, 100 U. S. 625, 25 L. Ed. 607; Montgomery v. Ætna Life Ins. Co., 38 C. C. A. 553, 97 Fed. 913; Goddard v. Crefield Mills, 21 C. C. A. 530, 75 Fed. 818; Safter v. United States, 31 C. C. A. 1, 87 Fed. 329. It is also doubtless true that, when a defendant in a criminal case takes advantage of the statute and testifies in his own favor, the government may comment on his testimony and draw inferences therefrom as freely as if he were an ordinary witness and not the accused. It is only where the accused fails to testify that the statute prohibits unfavorable comment and attempts to create a presumption against him because he has not done so. Conceding this much, we are nevertheless of opinion that the instruction in question went too far, in that it required the accused to explain every fact and circumstance which had been introduced against him, and gave to them additional probative force because he had not done so or attempted to do so. Furthermore, it left the jury at full liberty to determine what matters which had been given in evidence were 'material to the issues in the case,' without directions on that point, and equal liberty to determine what matters were 'naturally within his knowledge' and susceptible of explanation. The testimony in the case had taken a very wide range and covered a considerable period of time. While on the stand some facts and circumstances that had been introduced in evidence may have been overlooked by the accused or by his counsel, and he may not have been interrogated with respect thereto for that reason, or they may have been regarded as of no importance, or the circumstances may have been of a character which admitted of no further explanation, being in themselves such circumstances as the jury could ignore or draw such inferences therefrom as they thought proper. And yet the instruction was of a nature which permitted the jury to draw unfavorable inferences against the accused, because in the course of his examination he had not alluded to every fact and circumstance already in evidence, and given an explanation thereof consistent with his innocence. We are satisfied that the instruction cast an undue burden on the defendant, and that it was also misleading. Moreover, we are not able to say with certainty, as we must to uphold the verdict, that the defendant was not prejudiced by the instruction."

The instruction held erroneous in the case just cited, and the giving of which entitled the defendant to a new trial, was by no means so strong against the defendant there as is that against the defendant Diggs in which the jury was told:

"It is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so"

—in other words, that the law drew such an inference in respect to material testimony against him where he remained silent in regard to it. I think it clear that that instruction was erroneous and threw an illegal burden upon the defendant; it was omitted from the instructions given in the case of Caminetti, subsequently tried.

In the prevailing opinion in the present cases the court cites, as sustaining its holding that the trial judge was right in instructing the

jury in the Diggs case that it was "a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so," the decisions of the Supreme Court in the cases of Reagan v. United States, 157 U. S. 301, 15 Sup. Ct. 610, 39 L. Ed. 709, Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819, Fitzpatrick v. United States, 178 U. S. 304, 20 Sup. Ct. 944, 44 L. Ed. 1078, and Sawyer v. United States, 202 U. S. 150, 26 Sup. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269. How very far those cases are from holding anything of the sort may be very clearly shown by making a brief reference to each of them. Thus:

The defendant in the case of Reagan v. United States, 157 U. S. 301, 15 Sup. Ct. 610, 39 L. Ed. 709, was charged with the crime of smuggling, and took the stand as a witness in his own behalf. The Supreme Court, in considering the instruction of the trial court in respect to that matter, said:

"By the Act of March 16, 1878, c. 37, 20 Stat. 30, a defendant in a criminal case may, 'at his own request, but not otherwise, be a competent witness.' Under that statute it is a matter of choice whether he become a witness or not, and his failure to accept the privilege 'shall not create any presumption against him.' This forbids all comment in the presence of the jury upon his omission to testify. Wilson v. United States, 149 U. S. 60, 13 Sup. Ct. 765, 37 L. Ed. 650. On the other hand, if he avail himself of this privilege, his credibility may be impeached, his testimony may be assailed, and is to be weighed as that of any other witness. Assuming the position of a witness, he is entitled to all its rights and protections, and is subject to all its criticisms and burdens. It is unnecessary to consider whether, when offering himself as a witness as to one matter, he may, either at the will of the government or under the discretion of the court, be called upon to testify as to other matters. That question is not involved in this case, and we notice it simply to exclude it from the scope of our observations. The privileges and limitations to which we refer are those which inhere in the witness as a witness, and which affect the testimony voluntarily given. As to that he may be fully cross-examined."

It is thus seen that the Supreme Court there expressly declared that the question here involved was not involved in that case, and that it was mentioned only for the very purpose of excluding it from the scope of its observations in that case.

The case of Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819, came before the court on an appeal from an order of the Circuit Court made upon a return of a writ of habeas corpus remanding the petitioner to the custody of the marshal, he having refused to answer a certain question as a witness before the grand jury in relation to a charge then under investigation by that body against certain officers and agents of a certain railway company for an alleged violation of the Interstate Commerce Act; and the question before the Supreme Court was whether the Act of Congress of February 11, 1893, c. 83, 27 Stat. 443 (Comp. St. 1913, § 8577), which enacts that "no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpœna of the Commission, * * * on the ground or for the reason that the testimony or evidence, documentary or otherwise,

required of him, may tend to incriminate him or subject him to a penalty or forfeiture," sufficiently satisfies the constitutional provision declaring that no person shall be compelled in any criminal case to be a witness against himself. The few lines quoted from the opinion in that case by the court in the present cases give, in my opinion, a very inadequate idea of what the Supreme Court held in Brown v. Walker, and in no respect sustain, as I view it, the ruling of the court below upon the question under consideration in the present cases.

So in the case of Fitzpatrick v. United States, 178 U. S. 304, 315, 20 Sup. Ct. 944, 44 L. Ed. 1078, the question here involved did not arise; the question there being one as to the extent to which cross-examination was proper where the defendant takes the stand in his own behalf—the court saying at page 315 of 178 U. S., at page 948 of 20 Sup. Ct. (44 L. Ed. 1078):

"Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf, and makes his own statement, it is clear that the prosecution has a right to cross-examine him upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts. The witness having sworn to an alibi, it was perfectly competent for the government to cross-examine him as to every fact which had a bearing upon his whereabouts upon the night of the murder, and as to what he did and the persons with whom he associated that night. Indeed, we know of no reason why an accused person, who takes the stand as a witness, should not be subject to cross-examination as other witnesses are. Had another witness been placed upon the stand by the defense, and sworn that he was with the prisoner at Clancy's and Kennedy's that night, it would clearly have been competent to ask what the prisoner wore, and whether the witness saw Corbett the same night or the night before, and whether they were fellow occupants of the same room. While the court would probably have no power of compelling an answer to any question, a refusal to answer a proper question put upon cross-examination has been held to be a proper subject of comment to the jury. State v. Ober, 52 N. H. 459 [13 Am. Rep. 88]. And it is also held in a large number of cases that, when an accused person takes the stand in his own behalf, he is subject to impeachment like other witnesses. If the prosecution should go farther and compel the defendant, on cross-examination, to write his own name or that of another person, when he had not testified in reference thereto in his direct examination, the case of State v. Lurch, 12 Or. 99 [6 Pac. 408], is authority for saying that this would be error. It would be a clear case of the defendant being compelled to furnish original evidence against himself. State v. Saunders, 14 Or. 300 [12 Pac. 441], is also authority for the proposition that he cannot be compelled to answer as to any facts not relevant to his direct examination."

There is here cited by the Supreme Court, with its apparent approval, a decision of the Supreme Court of Oregon to the effect that a defendant to a criminal case *cannot be compelled* to *answer as to any facts not relevant to his direct examination.* And, in the case of Sawyer v. United States, 202 U. S. 150, 26 Sup. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269, what the Supreme Court held was that where a defendant takes the stand in his own behalf he waives his constitutional privilege of silence and the prosecution has the right to cross-examine him *upon his evidence in chief* with the same latitude

as though he were an ordinary witness as to circumstances connecting him with the crime; the court, at page 165 of 202 U. S., at page 579 of 26 Sup. Ct. (50 L. Ed. 972, 6 Ann. Cas. 269), saying:

"It has been held in this court that a prisoner who takes the stand in his own behalf waives his constitutional privilege of silence, and that the prosecution has the right to cross-examine him upon his evidence in chief with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the crime. Fitzpatrick v. United States, 178 U. S. 304 [20 Sup. Ct. 944, 44 L. Ed. 1078]."

In each of the present cases there was a sharp conflict, as will be seen from the quotations already made, between the testimony of the two women and that of Diggs upon the question as to whether the women were persuaded, induced, or coerced into taking the Reno trip. That conflict is further shown by additional testimony of Diggs, and by the testimony of Caminetti. The latter was not cross-examined at all, and his direct testimony was short and confined to matters also antedating the trip to Reno, and mainly to reported threats of publicity of the relations existing between Diggs, himself, and the women, and threats of arrest and personal violence, and concluded with these statements:

"I remember having been at the Peerless restaurant on Saturday afternoon, March 8, 1913. I saw Maury I. Diggs there at that time. There were different people there at different times. Miss Norris and Miss Warrington were not there all the time. They were there during part of the time. I had a conversation with Maury I. Diggs in the Peerless restaurant with reference to something his father had said to him while in San Francisco. The Peerless restaurant is in the city of Sacramento on Ninth street between K and L. Miss Warrington was there when I got there, and later on, just after I got there, Miss Norris came in. Mr. Diggs said: 'I have just come up from San Francisco, and my father is coming up Monday to have you and Lola and Marsha arrested. He claims that you and Lola and Marsha are as much responsible for the position in which I am in as I am, and that he is going to put you three through everything I have gone through.' He said: 'I tried to keep him from coming up, but I could not, and he will be up here to-morrow morning.' That is about the substance of what he said. He went over it and enlarged upon it. I replied: 'Then I am gone.' I meant that when Mr. Diggs got there to have me arrested that I would not be there, that I was going to get out of town. First Mr. Diggs said that if I went it would be necessary for him to go, and when he said that Miss Warrington said: 'I am going, too; I can't stay here if you leave.' And Lola—Miss Norris—said that she could not go, although she hated to stay in Sacramento and face things she thought or knew were going to happen, but she could not leave. Thereupon Miss Warrington turned around and said: 'Lola, I am going, and you have got to go, too.' I believed the statements made by Mr. Diggs to me as having come from his father were true. I had already had a talk with him over the phone in which he said the same things, and by the tone of his voice I knew that he was extremely angry with me at that time, and from what Mr. Diggs said I gathered that his anger had grown. I told Miss Norris and Miss Warrington and Maury I. Diggs of the conversation I had had with Mr. Lesley, to which I have testified. Prior to the conversation at the Peerless restaurant I told them about what Mr. Lesley had said."

### Additional testimony of Diggs is as follows:

"I said to Marsha: 'That is enough; the juvenile officers are after us; my father is here to carry out his intentions, and I am going to go. I am going to get out of this town for awhile. I am going to go away from here;

this is too hot for me.' Then Marsha said: 'Well, old boy, believe me, you're not going away and leave me here.' I said: 'Miss Warrington, you can do just as you please; but I am going to go away from here for awhile. I have too much to lose, and I have too good a family to bring trouble down on them, and I am going to go away.' She said: 'I am going too; you are not going away and leave me.' Thereupon Mr. Caminetti spoke up something about Miss Norris. Then she said: 'If Miss Norris doesn't want to go, I'll make her go; she has got to go away with me.' Miss Warrington said that about Miss Norris. * * * During the last week ending March 9th Miss Warrington and Miss Norris met me at the Columbia Hotel. They came up and seen me about 4 o'clock in the afternoon. I think that either Mr. Caminetti told them, or I told them, that I was there. I believe that I called Miss Warrington up. Miss Warrington came up there. It was in regard to our conditions. The specific arrangement was for all to come up there, whether it was on my suggestion or Mr. Caminetti's; I have forgotten which. I told her that I thoroughly and positively made up my mind to leave town. I said: 'I am going to Los Angeles for a week or two, and I have just got to go; that is all there is to it.' I was very much worried; in fact, I was scared to stick my nose out of that room. On that occasion I told her all about my business, all about my relations, and I told her that this thing was getting too much for me; that I had too much to lose, and had a good home, and a good wife, and too nice a child to take any chances. I said: 'Miss Warrington, we have to quit our going together; we have to cut it out; every-body is getting onto us.' She broke in and said: 'Yes, you bet your life they're getting onto us; a friend of mine, who is a newspaper reporter, told me we were going to be written up in the Sacramento Bee.' I said: 'Who was it?' She said: 'Alfred Putnam.' I said: 'What did he say to you?' She said that he said that one of the editors had got wise to our actions and had an article all written up, and that he was going to run it, and was going to publish it immediately, but through his influence, and through his respect for my father, owing to the fact that they were both Masons, had got the article squelched, and got it stopped. I said: 'Are you sure they had an article?' She said: 'Why, positively, he told me it was all written up and he saw it.' I said: 'Don't you think that is a little grand stand play on Putnam's part?' and she said: 'No, sir; that is the truth.' I said: 'By jinks; that is getting pretty serious.' She said: 'Yes, I guess you have had about all you want of the Sacramento Bee, haven't you?' And I said: 'Yes, I had; that I didn't want to get into any tangle with them; that I didn't want them to ever write me up.' Then the conversation drifted on back into the fear that was overtaking the whole crowd. I thoroughly declared myself that I was going. Marsha said: 'Well, if you're going, I am going, too; you're not going to leave me here with the bag to hold and face all this trouble.' I said: 'Miss Warrington, you can do just exactly as you please about it; I don't intend to ask you to go, or ask you to stay home; it is your business, and you can do as you please.' She said: 'Well, I am going.' Lola Norris said: 'I can't go. I am not going; my father is not feeling well, and it would break my mother's heart for me to go.' And Marsha said: 'Yes; and it will break my father's heart, too.' Somebody said something about her mother. She said: 'Well, I don't care about my mother; my mother and I don't get along anyhow.' Miss Warrington said she would like to go to spite her mother, her stepmother. Her aunt is her stepmother. She said her father had always been very good to her, and she liked her father, and didn't want to leave him. I said: 'That is up to you; you people can do as you please, but I am going to get out of here. That is final and positive. I am going. I don't care what the rest of you do—Mr. Cami-netti, or any of you. I have too much to lose.' When Lola said it would break her mother's heart to go, Marsha said: 'Well, I can't help that; you've got to go with me; you've got to go along with me.' Lola, to my knowledge, did not say whether she was going or not. Then Mr. Caminetti spoke up, and he says these words very distinctly— He was sitting on the other side of the table. He says, 'Now, girls, I want to make myself understood right here;' he says, 'If Diggs is going, I am going;' and he says, 'If you people go with us, that is your business;' he says, 'Now, I don't want you girls to leave with

the idea that you're going to get any great or glorious or glittering future; I want to go on record right here as saying that I don't want you to go; I would rather have you stay home here; I don't want to be bothered with women in this business, if Diggs and I are going to get arrested, and are trying to get away from arrest, we don't want to be hampered with women. I want to go on record right now as not persuading you girls to go, or asking you to go; on the other hand, if you are going to go, we would rather have you go in some other direction.' Marsha sat up and said: 'We are not going to go in any other direction; if you and Diggs are going, we will go with you; you can't leave us; if you leave us here, and leave us to go in another direction, we will never see you again; that will be the end of you; we will never see you again.' "

While there was testimony on the part of the government tending to show that both Diggs and Caminetti persuaded and induced the girls to go with them from Sacramento to Reno, there was on the part of both defendants testimony tending to show that neither of them did so, but, on the contrary, that their going was voluntary. If voluntary, the girls were necessarily accomplices with the men in the alleged violation of the act of Congress upon which the indictments are based, and could, as was expressly held by the Supreme Court February 1, 1915, in the case of United States v. Clara Holte, 236 U. S. 140, 35 Sup. Ct. 271, 59 L. Ed. ——, have been indicted and prosecuted for having conspired with the men for a violation of the "White Slave Traffic Act."

Whether or not the testimony tending to show that the women were accomplices was true was, as a matter of course, like all other questions of fact, one for the exclusive determination of the jury under appropriate instructions. Based upon the view, however, that the women were not accomplices of the men, the court below refused to give any of the instructions requested by the defendants upon the subject of accomplices, some of which correctly defined what constitutes an accomplice, and the proper caution and care with which the testimony of accomplices should be weighed and scrutinized by the jury, to which action of the court exceptions were duly taken by the defendants. In holding, as I do, that they should have been given, it is but fair to the learned judge of the court below to say that at the time the present cases were tried the decision of the Supreme Court in the case of United States v. Clara Holte, supra, had not been rendered.

While many of the states have statutes expressly providing that no one can be convicted of a crime upon the testimony of an accomplice without some corroboration of his testimony, there is no such statute of the United States, and while, therefore, it is not essential in the federal courts, as it is in the courts of such states, to a conviction upon the testimony of an accomplice that such testimony be corroborated, it is proper and generally recognized as the duty of the courts in all such cases to explain to the jury the nature of such testimony, and to caution them to scrutinize and weigh it with great care. Such general rule is thus stated in Greenleaf on Evidence (16th Ed.) §§ 380 and 381:

"§ 380. The degree of credit which ought to be given to the testimony of an accomplice is a matter exclusively within the province of the jury. It

has sometimes been said that they ought not to believe him, unless his testimony is corroborated by other evidence; and, without doubt, great caution in weighing such testimony is dictated by prudence and good reason. But there is no such rule of law; it being expressly conceded that the jury may, if they please, act upon the evidence of the accomplice, without any confirmation of his statement. But, on the other hand, judges, in their discretion, will advise a jury not to convict of felony upon the testimony of an accomplice alone and without corroboration; and it is now so generally the practice to give them such advice that its omission would be regarded as an omission of duty on the part of the judge. And considering the respect always paid by the jury to this advice from the bench, it may be regarded as the settled course of practice, not to convict a prisoner in any case of felony upon the sole and uncorroborated testimony of an accomplice. The judges do not, in such cases, withdraw the cause from the jury by positive direction to acquit, but only advise them not to give credit to the testimony.

"§ 381. But though it is thus the settled practice, in cases of felony, to require other evidence in corroboration of that of an accomplice, yet, in regard to the manner and extent of the corroboration to be required, learned judges are not perfectly agreed. Some have deemed it sufficient, if the witness is confirmed in any material part of the case; others have required confirmatory evidence as to the corpus delicti only; and others have thought it essential that there should be corroborating proof that the prisoner actually participated in the offense, and that, when several prisoners are to be tried, confirmation is to be required as to all of them before all can be safely convicted—the confirmation of the witness, as to the commission of the crime, being regarded as no confirmation at all, as it respects the prisoner: for, in describing the circumstances of the offense, he may have no inducement to speak falsely, but may have every motive to declare the truth, if he intends to be believed, when he afterwards fixes the crime upon the prisoner. If two or more accomplices are produced as witnesses, they are not deemed to corroborate each other; but the same rule is applied, and the same confirmation is required, as if there was but one."

The case of Bennett v. United States, 227 U. S. 333, 33 Sup. Ct. 333, 57 L. Ed. 531, was based upon the same act of Congress as the present cases, the White Slave Traffic Act of June 25, 1910; and it seems from the opinion of the court that, like the cases here, two women were involved in that alleged unlawful transaction, one Opal Clarke, and the other Ella Parks. The defendant there was indicted for having caused the illegal transportation of Opal Clarke, and in considering the objection to one of the instructions upon the question of corroborating the testimony of one of the women the Supreme Court said:

"The basis of this contention is that Opal Clarke was the accomplice of defendant as to Ella Parks, and that hence the court erred in its instructions to the jury in regard to the extent of the corroboration Opal Clarke's testimony had received. The instruction complained of submitted to the jury the fact, and warned against a conviction upon the uncorroborated testimony of an accomplice, and said: 'Necessarily, if you find that she was an accomplice with respect to these charges, or any of them, you will then necessarily have to inquire into the facts as to whether or not there is corroborating testimony. There is evidence tending to corroborate her testimony, and it is for you to consider its force and value and the weight to give to it.' The contention is that this was error, 'as the court instructed the jury that there was corroborating evidence, when the court should have charged the jury that it was for them to ascertain from the testimony whether or not there was corroborating testimony.' The objection is hypercritical. The court did not instruct the jury that there was corroborating testimony, but testimony of that tendency, and added that the force and weight of its corroborating power was for the jury to determine."

In Blashfield on Instructions to Juries, pp. 484, 485, it is said:

"Except in one state, it seems to be the well-settled and almost universal practice for the court to instruct that the testimony of accomplices should be viewed by the jury with great care and caution. It has been held, however, that, in the absence of a request, failure to give such instruction cannot be assigned as error. There is some diversity of opinion as to whether a refusal to give an instruction of this nature, when requested, will be ground for reversal. There are rulings both ways on this point"—citing a large number of cases.

In the case of United States v. Ybanez (C. C.) 53 Fed. 536, 540, the court, in speaking of the defendants there said:

"Some of them are, by their own statements, clearly accomplices, while at least two others claim that they were captured by Garza's men, and were compelled to join the expedition under the pressure of force and threats of violence. If any of the witnesses testifying in the case were constrained or compelled to go with, and remain in, the expedition, because of violence, or threats of violence, offered to them by men engaged in the enterprise; that is, if they did not join and remain with the expedition voluntarily, but were compelled to do so by men engaged therein, then they would not be regarded, in law, as accomplices, for an accomplice is a voluntary assistant in a crime. 'He is a person who knowingly and voluntarily, and with common intent with the principal offender, unites in the commission of an offense.' Bearing in mind this distinction between a person who is an accomplice and one who is not, you are further instructed that whether the testimony of an accomplice be true or false is a question which, like all controverted questions of fact, is submitted solely to you to determine for yourselves. It is not within the province of the court to pass upon controverted questions of fact, or upon questions affecting the credibility of witnesses. But it is the duty of the court to call your attention to certain rules which obtain in courts of justice in reference to these persons known in law as 'accomplices.' On this point you are instructed 'that a particeps criminis—that is, an accomplice —notwithstanding the turpitude of his conduct, is not on that account an incompetent witness.' It is the settled rule in this country that an accomplice in the commission of a crime is a competent witness, and the government has the right to use him as a witness. It is the duty of the court to admit his testimony, and that of the jury to consider it. The testimony of an accomplice is, however, always to be received with caution, and weighed and scrutinized with great care by the jury; and it is usual for courts to instruct juries—and you are so instructed in this case—not to regard the evidence of an accomplice unless he is confirmed and corroborated in some material parts of his evidence connecting the defendant with the crime, by unimpeachable testimony. But you are not to understand by this that he is to be believed only in such parts as are thus confirmed, which would be virtually to exclude him, inasmuch as the confirmatory evidence proves, of itself, those parts it applies to. If he is confirmed in material parts connecting the defendant on trial with the offenses charged in the indictment, he may be credited in others; and the jury will decide how far they will believe a witness, from the confirmation he receives by other evidence, from the nature, probability, and consistency of his story, from his manner of delivering it, and the ordinary circumstances which impress the mind with its truth. U. S. v. Kessler, Baldw. 22 [Fed. Cas. No. 15,528]; U. S. v. Reeves [C. C.] 38 Fed. 409, 410. With the rules above announced for your guidance, you will give to the testimony of such witnesses as have been shown to be accomplices such weight as you consider it entitled to receive."

In the case of United States v. Van Leuven (D. C.) 65 Fed. 78, 81, Shiras, District Judge, said:

"At the common law, as the same existed in England, in the progress and development of that law the conclusion was reached by the judges charged with the duty of presiding over trials of criminal cases that it was unwise

for a jury to convict a person upon the uncorroborated testimony of an accomplice, and therefore judges cautioned the juries in this particular, and charged them that it was unwise for the jury to convict upon the uncorroborated testimony of an accomplice. In the state of Iowa it has been enacted as a provision of statutory law that no person shall be convicted of a crime upon the uncorroborated testimony of an accomplice, but there must be corroborative testimony tending to connect the defendant with the commission of the offense. I have always deemed it my duty as a judge of a court of the United States, and trying cases arising in the state of Iowa, and where the defendant is a citizen of this state, to say to the jury that they cannot convict upon the uncorroborated testimony of an accomplice; and when a case stands before a jury on that kind of evidence alone I assume the duty of charging them to return a verdict of not guilty, but, if the testimony of an accomplice is accompanied by evidence tending to corroborate the same in its material statements, then it is the duty of the court to submit the whole to the jury, and it is for the jury to determine whether the corroborating evidence is of such a character and weight as justifies the jury in giving weight to the testimony of the accomplice."

The state of California has a statute similar to the statute of Iowa referred to in the last-cited case. But here we are not called upon to consider whether the federal courts in California should go to the extent indicated in the opinion in that case. I am, however, clearly of the opinion that the testimony in the present cases was such as to entitle the defendants to an instruction explaining to the jury what constituted an accomplice, and the care and caution with which the testimony of accomplices should be weighed and scrutinized, especially in view of the circumstances under which these trials took place, and of at least one circumstance occurring during the trial, which, however, need not be specifically referred to, since there is to be no other trial; for if it be true, as some of the testimony undoubtedly tends to show, that the women went voluntarily with the men in interstate commerce for the purposes stated in the indictments, they were manifestly accomplices with them in the violation of the White Slave Traffic Act, and might have been indicted, prosecuted, and punished as conspirators under the provisions of the United States Penal Code of March 4, 1909, c. 350, § 37, as was expressly decided by the Supreme Court in the very late case of United States v. Clara Holte, already cited.

In the case of Crawford v. United States, 212 U. S. 183, 204, 29 Sup. Ct. 260, 268 (53 L. Ed. 465, 15 Ann. Cas. 392) the Supreme Court, in speaking of the testimony of an accomplice—one Lorenz— said:

"But the evidence of a witness, situated as was Lorenz, is not to be taken as that of an ordinary witness, of good character, in a case whose testimony is generally and prima facie supposed to be correct. On the contrary, the evidence of such a witness ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses. In many jurisdictions such a man is an incompetent witness unless he has been pardoned. The facts surrounding this case make it particularly important that the rule in regard to material errors should be most rigidly adhered to. If it be not clear that no harm could have resulted from the commission of this material error, the judgment should be reversed."

And in the very recent case of Lung v. United States, decided by this court January 4, 1915, 218 Fed. 817, 134 C. C. A. 505, we pointed out, as has been above shown, that while in the federal courts the tes-

timony of a confessed accomplice need not be corroborated to support a conviction, such testimony should be received with suspicion and with the greatest care and caution, and not taken as that of an ordinary witness of good character, generally and prima facie supposed to be true, and that, in the case then under consideration, the instructions of the trial court not being contained in the record, and there being no complaint in respect to them, the presumption was that the jury was so instructed.

For the reasons stated, I think that in each case the judgment should be reversed, and the case remanded for a new trial.